OPINION OF THE COURT
Michael A. Ambrosio, J.
This case, which raises issues of first impression in this *762 State, involves a family with a long history in this court. In early 1986, family offense petitions first brought the C. family to the court’s attention. Thereafter, a child neglect proceeding was filed by the Department of Social Services charging that the parents failed to provide adequate shelter for the children, Beverly, age 3 and Oscar, age 10 months. During the pendency of that action, the respondent mother, Beverly C., left the jurisdiction and returned to Alaska. She has never returned. A finding of neglect was made against both parents and the children were placed.
On March 23, 1987, the court was made aware of an allegation that the child Beverly had been sexually abused while in foster care. Despite extensive effort neither the nature nor perpetrator of the abuse could be learned.
In October 1987 the court returned the children to the care of their father under supervision of the Child Welfare Agency (CWA).
On November 9, 1988, the Commissioner of Social Services (CSS) filed the current neglect petition against the respondent father, Mr. C., alleging that the children were residing in an apartment which lacked heat, electricity, working bathroom facilities and stove. Based on these allegations the children were removed from the home and paroled to the care of a friend of the father, Mrs. Aguirre, who quickly surrendered the children to the Commissioner of Social Services for placement in foster care.
The fact finding was commenced on January 19, 1989. It was continued on February 3, 1989, when an attorney appeared to represent the Indian Village of Twin Hills. The C. children are members of this Alaskan Indian Tribe and are, therefore, entitled to the protection of the Indian Child Welfare Act (25 USC § 1901 et seq.). It is the applicability of the ICWA to a child neglect proceeding which raises issues of first impression in New York.
The fact-finding hearing concluded on March 17, 1989. The court made a finding of neglect due to the father’s failure to provide adequate shelter. The court then ordered an investigation and report on Mr. C.’s current circumstances as well as a mental health study and adjourned the matter to June 23, 1989.
On April 28, 1989, an order to show cause requesting a termination of Mr. C.’s supervised visitation was filed by CSS. The Commissioner alleged that Mr. C.’s visitation should be *763 terminated because it so disrupted the children and their foster care parents that the children had to be moved from one foster care parent to another. In approximately four months after leaving Mrs. Aguirre, the children went to St. Christopher-Ottilie, then to the Astor home, then Lutheran Community Services and finally to Central Brooklyn Coordinating Council. In each case the agency found Mr. C. so trying that they refused to continue to care for the children. After a hearing the court terminated Mr. C.’s visitation to allow the children to remain in a stable foster care environment without the threat of constant disruption which Mr. C.’s visits had caused.
The dispositional hearing in which Mr. C. insisted in proceeding pro se commenced on September 13, 1989 and continued over 13 additional days. The court heard testimony from a number of witnesses including Dr. Charlotte Slopak, Ph.D., senior psychologist of the court’s Mental Health Clinic and Dr. Arcaya, a psychologist retained by Mr. C.
The testimony of Dr. Slopak, who interviewed Mr. C., Oscar C., Jr., Beverly C., and Mary J., maternal grandmother of the children, and Vivian J., maternal aunt of the children took several days. Her recommendation was that Mr. C. not be allowed to have custody of the children. She diagnosed Mr. C. as suffering from a paranoid personality disorder with borderline features (DSM III R 301.00). According to Dr. Slopak Mr. C. suffers from acute paranoia, believing that there is a plot against him to prevent him from having custody of his children. This belief was manifested, in part, by his demand that the interview with the psychologist be tape recorded. The court also notes that on several occasions Mr. C. was searched upon entering the courthouse and tape recorders were removed from his person.
Dr. Slopak’s diagnosis of Mr. C.’s paranoid personality was concurred in by Dr. Arcaya, Mr. C.’s psychologist. He also testified that Mr. C. was overly suspicious, and viewed the court, his lawyers, CWA, the Steinway Mental Health Clinic, and the foster care system as in some sort of conspiracy against him. Mr. C. has a low level of frustration and little patience, according to Dr. Arcaya. He also perceives anyone who is associated with his case as being his enemy. This condition was diagnosed by Dr. Arcaya as being a chronic, lifelong disorder absent psychological intervention. He needs therapy in order to learn how to deal with frustrations, develop coping skills, and learn how to relate to others. Dr. *764 Arcaya’s prognosis for Mr. C. was fair to good and he opined that "given the absence of external stress” he could care for his children.
In assessing the evidence presented in this dispositional hearing the court notes that the C. children are "Indian children” as defined by 25 USC § 1903 (4).* Although the usual New York State evidentiary standard in dispositional hearings in child neglect cases is a fair preponderance of the evidence the ICWA supersedes this requirement and imposes a higher standard of clear and convincing evidence upon the court in this case. Thus, only if there is clear and convincing evidence that continued custody of the C. children by their father is likely to result in their serious emotional or physical damage may the court remove them from his care. (25 USC § 1912 [e].)
Despite the fact that Mr. C. loves his children and they love him the court finds by clear and convincing evidence that they cannot be safely returned to his care. Although Mr. C. appears to have rectified the dangerous and inadequate housing problem which led to the children’s most recent removal from his care in November 1988, his underlying mental disability is not so readily remedied. The court psychologist and Mr. C.’s privately retained psychologist agreed that he suffers from a paranoid personality disorder. Over the long history of this case in Family Court, every other psychotherapist who has come in contact with Mr. C. has reached a similar conclusion. While Mr. C.’s therapist, Dr. Arcaya, believes that the children may be safely returned to Mr. C., the court’s psychologist, Dr. Slopak, did not. The court believes that she is correct. Dr. Slopak had the opportunity to interview the children and review the voluminous record in this court. Dr. Arcaya did not. He was unaware of Mr. C.’s alcohol abuse history in Alaska. He did not know that Mr. C. had allowed his children to reside in a home without any utilities for several months. At best Dr. Arcaya concluded that in the absence of external stress Mr. C. could care for his two young children. However, whose life is free of external stress? More particularly, can a person who is suspicious and tends to perceive conspiracies against him with a low level of frustration and little patience be expected to live a life free of external stress?
*765 Over the four-year history of this court’s involvement with the C. family it has tried to work with Mr. C. After the first finding of child neglect was made, the court ultimately returned the children to Mr. C.’s care. A year later this case was commenced and the children were again removed from their parent. During the year in which the children lived with him Mr. C. was supposed to attend the Steinway Mental Health Clinic to deal with his own mental disorder. Although Mr. C. did attend sporadically he insisted on bringing a tape recorder with him. While caring for his children Mr. C. became involved in a dispute with his landlady which resulted in a complete termination of utilities to his home. Mr. C. made no effort to rectify these conditions despite being financially able to do so. Since the children were removed from his care he alienated a series of foster care agencies with the result that his children have been repeatedly moved from one foster care home to another. Only the termination of visitation by the court has enabled the children to acquire some stability in their life.
Mr. C. has not only estranged himself from the children’s foster care agencies, even the children’s original caretaker, a friend of Mr. C., eventually abandoned the children after disagreements with their father. Mr. C.’s paranoia has been repeatedly demonstrated to impact harmfully upon his children. His paranoid and obsessional reaction to the child Beverly’s sexual abuse impacts unfavorably upon the child. Mr. C.’s insistence on referring to the abuse as a rape and his constant dwelling upon the incident with the child despite the recommendations of two child sexual abuse experts can only harm the child psychologically. To return these children to his care would be to assure them of a disorganized and chaotic life at the hands of a mentally impaired parent whose conspiratorial view of the world embroils him in endless disputes which have in the past and would continue in the future to endanger their psychological and physical well-being. The court is disinclined to again expose the children to these risks.
In the usual child neglect case the court is faced with a choice of returning the child to the parent or placing the child with the Commissioner of Social Services in foster care. In this case the ICWA establishes that a preference be given to a member of the Indian child’s extended family (25 USC § 1915 [b]). This preference has been described as "[t]he most important substantive requirement imposed on the state courts” by the act. (Mississippi Choctaw Indians v Holyfield, 490 US 30, *766 36 [1989].) The maternal grandmother, Mary J., who is a Native American, has asked to serve as her grandchildren’s foster parent. The Alaska Department of Health and Social Services submitted an evaluation of her home at the request of the New York City Department of Social Services. The report was favorable. Mrs. J. also traveled to New York in order to be evaluated by the court-appointed psychologist, Dr. Slopak, who recommended that the Cf children be placed in her care.
Mr. C. objected to the children being placed with Mrs. J. The guidelines for State courts (44 Fed Reg 67584) issued by the Bureau of Indian Affairs suggest that the request of the biological parents is to be considered in determining whether there is good cause for modifying the statutory preference. Here, one of the biological parents asks that the children not be given to their Indian grandmother. Mr. C. objects to Mrs. J. because he believes that she is too elderly to care for his children and because he insists that other relatives who reside in her home are alcohol abusers. Mrs. J. is 62 years old and resides with her husband and a young adult daughter who can assist her in caring for the children. In addition, both the Alaska Department of Health and Social Services and Dr. Slopak, the court-appointed psychologist, found Mrs. J. to be a suitable caretaker.
Mr. C. also notes that placing the children in Alaska would separate them from him by thousands of miles and the statute ordinarily requires the children be placed in a reasonable proximity to the child’s home (25 USC § 1915 [b]). Although the children would be separated by many miles from Mr. C. if the court authorizes placement with the maternal grandmother, they would be near their mother who also resides in Alaska. Moreover, the purpose of proximity is to reinforce the parental bond through visitation while the children are in foster care. In this case visitation has been suspended because of Mr. C.’s disruptive behavior. Because visitation cannot be reinstated until the respondent father undergoes successful psychiatric treatment for his serious mental disorder the principal benefit of proximity is absent in the case at bar. Although proximity to the parent is a mandate of the ICWA that mandate is qualified by the statute’s authorization for the court to take into account "any special needs of the child.” (25 USC § 1915 [b].) The special need of the C. children is for a stable home life in the care of a loving adult. Neither parent has been able to meet that need. Mrs. C., an alcohol abuser, *771 to have one Paul Wind named as chairman of the meeting, it is disputed if a motion was made to that effect. It is also disputed that such motion, if made, was seconded. It is undisputed that a vote to have Paul Wind act as chairman of the annual meeting was not taken.
It is also disputed whether or not Paul Wind appealed the decision of the Chairman Gilbert to adjourn the meeting. However, it is not disputed that the chairman did not entertain such appeal if made and it is clear that no vote was taken on any objection to the announced adjournment.
Neither does it appear that any vote was taken on a motion made and seconded to adjourn the meeting. A fair reading of the evidence as to this phase of the meeting is that it was characterized by considerable shouting, movement, confusion and disorder. The court finds the meeting was adjourned by action of the designated chairman, Wilson Gilbert.
There is no evidence that the adjournment was made on considerations other than inadequacy of space, and safety of those attending from danger of fire and possible physical harm through jostling and the collapse of flooring and stairway. There is absolutely no evidence that the adjournment was called for the purpose of thwarting the wishes of the shareholders. It is that consideration that makes the decision in Matter of Dollinger v Dollinger Corp. (51 Misc 2d 802) inapplicable. The court holds that the action of adjournment taken by the Chairman Gilbert was proper under the circumstances existing.
Apparently frustrated with the announced adjournment, Paul Wind then arrogated to himself the authority to announce that the meeting was adjourned to the first floor. Wind then proceeded to an office on the first floor, called a meeting to order and acting as self-appointed presiding officer entertained a motion that he, Wind, be appointed chairman of the meeting which he was already chairing. There is no record of the vote taken on this motion. This court holds the action of Mr. Wind and any purported vote naming him as acting chairman to be entirely without authority, devoid of legal sanction and completely void.
In so holding this court notes that the facilities sought to be used on the first floor of the corporate headquarters were also inadequate. The one room in which the adjourned meeting was attempted to be conducted was too small to accommodate the shareholders. Some were required to locate themselves in *772 adjacent offices where they could neither see nor hear the proceeding attempted to be conducted. At the same time an estimated 25 to 30 shareholders were still seated in the original third-floor room and a smattering of shareholders were located at various locations on the steps leading from the first to the third floor.
It was at the purported meeting on the first floor that it is contended that a new slate of directors of the company was elected. This court is asked to confirm their election.
There are so many irregularities that attend this purported election of directors that one scarcely knows where to commence to enumerate them.
The court has already noted that the facilities sought to be used would not accommodate the number of shareholders and that those shareholders in attendance ranged in location from the third floor, to the stairways, to adjacent offices, all without ability to participate in the proceeding attending the purported election of directors.
While an attempt was made by officers and employees to ascertain the identity and eligibility of voters to participate in the noticed annual meeting conducted on the third floor, no similar procedure was followed in the meeting of the insurgents later conducted on the first floor.
The oral acclaim procedure by count-oif followed for the purported election of directors at the first-floor meeting was not in conformity to the bylaws of the corporation which require that directors be elected by ballot, a deficiency which alone has been held to nullify an election. (Matter of F D. R. —Woodrow Wilson Democrats, 57 Misc 2d 743 [Sup Ct, NY County 1968].)
Further it appears that at the meeting on the first floor, an attempt was made to fill a vacancy on the board of directors. Again, the bylaws of the corporation provide that vacancies shall be filled by action of the directors.
Finally it appears that at the meeting on the first floor an attempt was made to change the corporate name of the company. Section 1208 (a) (1), (2) of the Insurance Law specifically provides that such action may only be taken at a meeting called for that purpose and then only by action of three fourths of the members present. The agenda for the annual meeting contained no reference to a change of corporate name and thus the issue was improperly presented to the shareholders. Further, there is no record that would indicate *773 by what percentage the motion to change the corporate name was passed.
There is no question but that the operation of corporate meetings lies with the board of directors of a corporation. Our courts are not only reluctant but, in fact, precluded, from intervening in the lawful and legitimate furtherance of corporate business. However as Justice Edgcomb observed in writing the decision for the Fourth Department, Appellate Division, in the case analogous to the one at bar: ”[I]f reasonable grounds exist to indicate that the election under review has not been conducted in a proper, regular or fair manner, it should not be confirmed. If the result is not free from suspicion, or is clouded in doubt, and justice demands, we may in all fairness require the parties to start over again. When right, justice and fair play require, a new election should be ordered (Matter of Bogart, 215 App.Div. 45.)” (Matter of Kaminsky, 251 App Div 132, 139-140 [4th Dept 1937], affd 277 NY 524 [1938].)
For all of the reasons noted this court is compelled to follow the rule and the application of that rule made in Matter of Kaminsky (supra) and accordingly orders that judgment be entered refusing to confirm the election of any persons as directors at the annual meeting of the shareholders of Allegany Co-Op Insurance Company on April 11, 1990 and that in the interest of justice, a new annual meeting of the shareholders be convened in conformity to past practices, applicable bylaws and statutory provisions pertaining thereto.

 The court was informed by affidavit of Deborah Tennyson, Executive Director, Bristol Bay Native Association, dated September 4, 1987, that the C. children are members of the Twin Hills Tribe, and are thus entitled to the protection of the ICWA.