[No. 25528-6-II.   Division Two.   March 23, 2001.]

*In the Matter of the Interest of* NATASHA MAHANEY, ET AL. ERIKA MAHANEY, *Respondent*, v. MARK S. MAHANEY, ET AL., *Appellants*.

*Jennifer K. Dewald*, for appellants.

*Jeffrey A. Robinson* (of *Gordon Misner & Robinson*), for respondent.

HUNT, J. — Rebecca Johnston appeals the trial court's denial of her request to return custody of her two children. Johnston had originally asked Erika Mahaney, the children's paternal grandmother, to care for her children temporarily while she reoriented her life. But when Johnston asked for their return a year later, Mahaney refused and petitioned the court for custody, which the court ordered. Johnston argues on appeal that the trial court's refusal to return her children, leaving them instead in Mahaney's custody, violates the Indian Child Welfare Act of 1978 (ICWA). We agree and reverse.

## FACTS

### I. MOTHER'S INITIAL VOLUNTARY REQUEST FOR GRANDMOTHER TO TAKE TEMPORARY CUSTODY

Rebecca Johnston (f/k/a/ Gollner) is the Native American mother of two minor children, Natasha and Jesse Mahaney.[1] Also a native Alaskan, Johnston is enrolled in the Tlingit and Haida tribes of Alaska. Both children are eligible for membership in these two tribes, as well as in the Sitka tribe of Alaska. Johnston and her children originally

---

[1] Natasha, 12, was born November 13, 1988; Jesse, 11, was born February 20, 1990.

lived in Alaska with the children's father, Mark Mahaney (Mark), who is not Native American.

In 1993,[2] Johnston and Mark, both alcohol abusers, gave temporary custody of their children to Mark's mother, Erika Mahaney (Mahaney). Mahaney was also a resident of Alaska. Johnston asked Mahaney to care for the children temporarily until she could establish a stable home environment for them. Thereafter, Johnston intended to take responsibility for her children and bring them back home to live with her.[3] Mahaney agreed, took the children into her home, and has cared for them for the past eight years.

## II. MOTHER'S REQUEST FOR CHILDREN'S RETURN; GRANDMOTHER'S REFUSAL

Johnston stopped abusing substances, obtained a job, and established a safe living environment for herself and her children. In June 1993, Mahaney left Alaska and moved the children to Tacoma, Washington. The next month, Johnston informed Mahaney that she was prepared to care for her children and asked for their return. Mahaney refused.

On June 20, 1994, in Pierce County, Washington, Mahaney, represented by counsel, filed a "nonparental custody petition" under RCW 26.10.030(1); her petition failed to mention that the children were Native American.[4] Johnston received service on July 2, 1994, but she was unable to afford counsel and to respond immediately due to her "low income." None of the tribes received service.[5]

---

[2] Mahaney acknowledges in her custody petition that both children lived with Johnston in Alaska from at least March to June 1993.

[3] Johnston broke up with Mark and has not had further contact with him. The children's guardian ad litem reported that, at the time of Mahaney's custody petition five years later, Mark was still actively abusing drugs and alcohol and did not participate in the children's lives.

[4] Mahaney is not Native American.

[5] Once the trial court became aware that this case involves an Indian mother and Indian children, ICWA required notice to their tribes of Mahaney's custody petition. 25 U.S.C. § 1912(a) (In an involuntary proceeding where court has such knowledge, the party seeking foster care placement of an Indian "shall" notify the

### III. Trial Court Order—Temporary Custody To Grandmother

On July 22, 1994, a superior court commissioner awarded temporary custody to Mahaney. On March 27, 1995, Johnston filed a "[r]esponse to petition for third party custody," in which she (1) objected to the commissioner's temporary award of her children's custody to Mahaney; (2) denied allegations against her; (3) requested return of her children's custody to her and/or a trial; and (4) explained that "low income and . . . my inability to secure legal representation" had delayed her response.

Johnston informed the court that she opposed Mahaney's further custody of the children. In essence, Johnston revoked her original temporary transfer of custody to Mahaney, which was no longer voluntary. There were no filed dependency petitions for the children or parental termination proceedings against Johnston. Yet Mahaney retained custody.[6]

During the past several years, the children have seen various counselors and therapists. Both children (Natasha in particular) have psychological and emotional problems[7] and special needs. In 1997, Johnston was finally able to obtain counsel, who filed a notice of revocation of temporary custody.

---

child's tribe of proceeding and the right to intervene.). Although the tribes participated in a limited fashion below, even without formal notice, they are not parties to this appeal.

[6] Johnston also asserts that during the years since Mahaney removed her children to Tacoma, Johnston has attempted contact with her children on numerous occasions but either Mahaney or a counselor has thwarted her efforts. Mahaney contends to the contrary that such efforts were either too sporadic or disruptive.

[7] Johnston acknowledges that her past behaviors, as well as the behaviors of others around her, may have contributed to her children's problems. But she contends that their separation from her and the ongoing struggle for custody have exacerbated their problems. For example, Ruthie Clark, a staff member for Comprehensive Mental Health, observed in one report that Natasha was "having separation anxiety due to being moved to Washington State & mother is in Alaska."

#### IV. TRIAL—CONTINUED CUSTODY WITH GRANDMOTHER UNTIL CHILDREN READY FOR REUNIFICATION WITH MOTHER

In March 1999, the case proceeded to trial.[8] The trial court awarded temporary custody to Mahaney and ordered a reunification plan to return the children to Johnston. The court commended Johnston's efforts to prepare for resumption of custody. But it found that because of the children's special needs, reunification needed to proceed slowly.

The court set requirements for Johnston to proceed toward reunification: (1) providing the children with information about their native Alaskan heritage; (2) a home study; (3) parenting classes; (4) classes to assist her reunification with her children; (5) counseling, including drug and alcohol abuse issues; (6) consultation with the children's counselor before any unsupervised contact with the children; and (7) "The children's counselor shall control any and all telephone contact with the children by the mother." Clerk's Papers at 29.

Johnston met all the court's requirements. In addition, she has been sober for over eight years, with no relapses. She ended her relationships with others who abused alcohol, drugs, and other people, including Mark. She has married; her husband, Brian Johnston,[9] does not drink or use drugs. There were no negative reports concerning Johnston's current home or life-style; rather, her home study recommended that the children would thrive if the children were returned to their mother in Alaska.

Yet, there was no reunification; nor was there a formal plan to accomplish reunification. Rather, the trial court left reunification open-ended until such time as the children

---

[8] There were a number of procedural delays between the initial temporary order and the trial and entry of the custody order. Mahaney retained several different attorneys, and both Mahaney and Johnston proceeded pro se at different points in the case. In May 1998, without notice from the court or Mahaney, the Sitka tribe intervened. Later in 1998, the Tlingit and Haida tribes also intervened.

[9] Brian has worked at a shelter for women who were victims of abuse and is the first male leader of the Ketchikan Campfire program—an after school program that gives youths a place to go and participate in productive activities.

were ready, acknowledging that reunification may never occur.

## V. APPEAL

In September 1999, Johnston retained new counsel. She filed a motion under ICWA for the return of her children. On December 3, 1999, the trial court denied Johnston's motion, and Johnston appealed, invoking RAP 2.2(a)(6) and 25 U.S.C. § 1914. Johnston specifically challenges (1) the court's finding that ICWA's "clear and convincing" standard was met, and (2) its ruling that the children can live with Mahaney as long as they want even though "reunification may never occur."

## ANALYSIS

### I. BACKGROUND

This case presents competing interests represented by different, well-intentioned parties, all of whom care about these children and their future. In years past, when the mother found herself in difficult circumstances, unable to care for her children properly, she asked the children's grandmother to take them temporarily while she put her life back in order.

The grandmother kindly obliged and not only has provided a home for her grandchildren, but also has extended extra efforts to address the children's special needs. But once the mother reoriented her life and requested the children's return, ICWA required that the grandmother return the children to their Native American mother.

The tribes and Johnston, backed by federal law, seek to sustain and to nurture both the tribe and the children by keeping alive their Native American cultural heritage. But Mahaney's initial temporary custody has become somewhat "permanent," not by formal court order, but rather as a result of Mahaney's having moved the children from their Alaska home to Tacoma, the passage of time, seriatim legal

proceedings, and the children's resultant estrangement from their mother.

The trial court did not become aware of ICWA's applicability until a few months before trial, years after Mahaney's 1994 custody petition. The trial court confronted difficult competing considerations and ICWA, which operates independently of state child custody procedures and the children's special needs. ICWA requires the children to reunite with their mother. But having lived eight years with their grandmother, mostly in Tacoma, they resisted moving back to Alaska to live with their mother. Acting in the "best interests of the children" under state law, the trial court ordered gradual reunification with their mother, the implementation of which was dependent solely on the children's readiness, which to date has not occurred.

■■ But ICWA controls here.[10]

[ICWA] was the product of rising concern in the mid-1970's over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their

---

[10] Both parties agree that ICWA applies. We have previously acknowledged that "ICWA[']s . . . applicability turns on two criteria": (1) whether the proceeding is a "child custody proceeding" as defined under § 1903(1); and (2) whether the child is an "Indian child" under § 1903(4), (9). *In re of Adoption of M*, 66 Wn. App. 475, 478, 832 P.2d 518 (1992). Here, both criteria are met, and neither party contests this on appeal. *See* Br. of Appellant at 10; Br. of Resp't at 12-13 (implicitly acknowledging ICWA's applicability).

Under ICWA, an Indian child is any unmarried person under 18 who is either a member of an Indian tribe or eligible for such membership and the biological child of an Indian tribe member. 25 U.S.C. § 1903(4). Here, there is no dispute that the children satisfy this definition.

Under ICWA, a child custody proceeding includes a "foster care placement," 25 U.S.C. § 1903(1)(i), which is defined as

any action removing an Indian child from its parent . . . for temporary placement in a foster home . . . where the parent . . . cannot have the child returned upon demand, but where parental rights have not been terminated.

Here, when the trial court granted Mahaney's petition for placement and custody of her Indian grandchildren, the court removed the children from their mother's custody and prevented her from having them returned on demand, even though her parental rights had not been terminated nor had termination been sought. Thus, the proceeding below was a child custody proceeding under ICWA.

families and tribes through adoption or foster care placement, usually in non-Indian homes.

*Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 32, 109 S. Ct. 1597, 104 L. Ed. 2d 29 (1989). Thus, Congress enacted ICWA "to protect . . . Indian children and to promote the stability and security of Indian tribes." 25 U.S.C § 1902. ICWA provides minimum requirements for courts to follow in cases involving custody or placement of an Indian child.[11] Here, ICWA requires that these Indian children return to and remain in their Indian mother's custody, unless there is clear and convincing evidence that (1) her actions and home would likely be harmful to them, and (2) such harmful behavior could not be remediated. On the record before us, these latter two provisos have been neither alleged nor proven.[12]

## II. ICWA Requirements

### A. Section 1912(e)—Placement With Non-Parent

Johnston contends that the trial court erred by failing to apply ICWA standards before awarding custody of her children to a nonparent. Mahaney counters that the standards were met because the children were harmed in the past while in Johnston's custody and, therefore, they are likely to suffer future harm if returned to her, especially in light of their special needs. The record supports Johnston's arguments for four reasons.

---

[11] The statute provides only two situations where ICWA does not apply—where placement is based on an act of delinquency or on an award of custody in divorce. 25 U.S.C. § 1903(1). Neither situation is present here. Furthermore, under statutory construction principles, because ICWA expressly excludes only two types of custody proceedings from its coverage, all other types of custody proceedings are presumed included in its provisions. *In re Custody of S.B.R.*, 43 Wn. App. 622, 625, 719 P.2d 154 (1986) (citations omitted).

[12] The trial court's delay in reunification with their mother was based on the children's emotional problems and reactions to the proposed reunification, rather than on any current negative assessment of their mother's parenting abilities. To the contrary, the trial court commended Johnston for her successes.

## 1. Likely Parental Harm

■ Under ICWA a state court cannot order "foster" (nonparental) placement of Indian children in an involuntary proceeding unless it first makes

> a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child.

25 U.S.C. § 1912(e). Here, it is uncontroverted that Johnston opposed Mahaney's petition for custody; thus, the state court trial below was an involuntary proceeding.[13]

■ In addition, there was no showing by clear and convincing evidence that Johnston's custody of the children is likely to result in serious emotional or physical harm to them.[14] ICWA does not indicate whether past trauma can serve as clear and convincing evidence of likely future harm. But the Bureau of Indian Affairs (BIA) has promulgated guidelines that provide insight into Congress' intent.[15] These guidelines aid our analysis.[16]

---

[13] Johnston not only filed her "[r]esponse to [p]etition for [t]hird [p]arty [c]ustody," she also filed a subsequent revocation of custody. She thereby established that the case was an involuntary placement proceeding under ICWA.

[14] The children's counselors testified the children feared moving back to Alaska to live with their mother and that Natasha might be suicidal. But these fears appear to have been based on past neglect and abuses by others while in their mother's care eight years earlier. The record does not show that the counselors' testimonies were based on either their or the children's contemporaneous experience with Johnston, any contemporaneous negative appraisal of Johnston and her home, or any expert prediction that Johnston herself or her home posed future danger to the children.

[15] ICWA provides that "the Secretary *shall* promulgate such rules and regulations as may be necessary to carry out the provisions of this chapter." 25 U.S.C. § 1952 (emphasis added). "[T]he Secretary" referred to is the Secretary of Interior. 25 U.S.C. § 1903(11).

[16] "[T]he construction of a statute by the executive department charged with its administration is entitled to great weight." *In re Junious M.*, 144 Cal. App. 3d 786, 792 n.7, 193 Cal. Rptr. 40, 43 n.7 (1983). Courts ordinarily give important significance to administrative interpretations of statutory terms. *Batterton v. Francis*, 432 U.S. 416, 424-25, 97 S. Ct. 2399, 53 L. Ed. 2d 448 (1977). Similarly, the Washington State Supreme Court has noted that properly promulgated, substantive agency regulations have the effect of law. *Manor v. Nestle Food Co.*,

■ To meet the ICWA standard of clear and convincing evidence for placement away from the parent's home, the guidelines require:

> [T]he evidence *must show the existence of particular conditions in the home* that are likely to result in serious emotional or physical damage to the particular child who is the subject of the proceeding. The evidence *must show the causal relationship* between the conditions that exist and the damage that is likely to result.

Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67,593 (Nov. 26, 1979) (emphasis added).

Here, Mahaney failed to meet this burden of proof. She has shown no current conditions in Johnston's home that would pose potential harm to the children. Nor did Mahaney's witnesses travel to Alaska or otherwise attempt to meet with Johnston to assess her personality, life-style, or parental fitness.

In contrast, the persons who conducted Johnston's court-ordered evaluations presented positive assessments of her progress, her parental preparations, and her access to helpful parenting resources. The social worker who prepared Johnston's Home Study Report heartily recommended the Johnstons' home as "a viable placement" for the children because of the "opportunity to thrive in this setting." These positive assessments resulted from in-person contacts with Johnston, including some in her home. Accordingly, the evaluators could realistically assess Johnston's current personal and home life and their likely effect on the children's well-being. In sum, the only evidence of current conditions in Johnston's home shows favorable conditions for the children's return to her custody.

---

131 Wn.2d 439, 445, 932 P.2d 628 (1997) (citing *Chrysler Corp. v. Brown*, 441 U.S. 281, 295, 99 S. Ct. 1705, 60 L. Ed. 2d 208 (1979)). *See also* 2 Am. Jur. 2d, *Administrative Law* § 160, at 182 (1994) ("legislative rule has the force and effect of law, if promulgated in accordance with a legislative delegation").

## 2. Preference for Tribal Connection

■ Both the BIA guidelines and ICWA's legislative history reflect Congress's findings that: (1) There is no more vital resource to the Indian community than its children;[17] and (2) an alarmingly high percentage of Indian children are placed in non-Indian foster homes because courts and private agencies often fail to recognize essential tribal relations and cultural and social standards existing in Indian communities.[18] The House Report accompanying ICWA explains that ICWA " 'seeks to protect . . . the rights of the Indian community and tribe in retaining its children in its society' " and that ICWA established as "[f]ederal policy that, where possible, an Indian child should remain in the Indian community." *Holyfield*, 490 U.S. at 37 (citing 1978 U.S.C.C.A.N. 7546).

■ Consistent with ICWA's purpose, the BIA guidelines establish "a preference for keeping Indian children with their families" and tribe. 44 Fed. Reg. at 67,585-86. The guidelines further provide that ICWA and all regulations, guidelines, and state statutes relating to it "shall be liberally construed" to meet those preferences, and *"[a]ny ambiguities in any of such statutes, regulations, rules, or guidelines shall be resolved in favor of the result . . . most consistent with these preferences."* 44 Fed. Reg. at 67,586 (emphasis added).

Although Johnston's tribe does not have a reservation, she lives near the Alaska Native Cultural Center and plans to take her children there when returned to her custody. She practices native arts and crafts at home. She and her husband are meeting with a Haida spiritual leader to learn Haida customs, language, and rituals. In contrast, not only is Mahaney not Native American, but also the record suggests that during most of the time she has had custody of the children, she has not acknowledged the children's

---

[17] 25 U.S.C. § 1901(3).

[18] 25 U.S.C. § 1901(4), (5).

Native American cultural heritage.[19]

It is to prevent such cultural estrangement that Congress designed a strict standard to keep children within Indian communities, absent a showing by clear and convincing evidence, obtained through direct contact, that current conditions exist in the parent's life or home that pose a likelihood of danger to the child. 25 U.S.C. § 1912(e).

### 3. Expert Witnesses

#### a. Assessment of Current/Future Parental Conduct

■ Before custody of an Indian child may be given to a non-parent, ICWA requires a qualified expert's testimony about whether the parent's continued custody will likely result in serious harm to the child. 25 U.S.C. § 1912(e); 44 Fed. Reg. at 67,593. In determining whether the parent poses a risk of harm to the child, the focus is clearly on the parent and his or her present fitness to care for the children in question.

But Mahaney's expert witnesses focused exclusively on the children, their reaction to experiences with their mother and her companions in years past, and their anxiety about leaving their grandmother in Tacoma and returning to their mother in Alaska. Thus, Mahaney's experts do not meet the statutory requirement of assessing current parental fitness.

Moreover, the BIA guideline commentary focuses not only on the parent's present and likely future conduct, but also on the parent's ability to modify his or her conduct if necessary for the child's welfare; the guidelines do not focus on *past* conduct of the parent:[20]

Basically two questions are involved. First, is it likely that the conduct of the parent[] will result in serious physical or

---

[19] In pointing out this departure from the ICWA standard, however, we do not intend to diminish Mahaney's dedication to her grandchildren's care or her more recent efforts to expose them to Native American culture.

[20] The first question is cast in the present tense—"is," not "was."

emotional harm to the child? Second, if such conduct will likely cause such harm, can the parent[] be persuaded to modify their conduct?

44 Fed. Reg. at 67,593 cmt. As for the first question, there has been no showing that Johnston's present conduct will likely result in serious physical or emotional harm to the children.[21]

Even if Mahaney had been able to establish the likelihood of future harm to the children based on Johnston's past conduct, the guidelines would not eliminate Johnston as a custodial parent. The second question implies an in-person evaluation to determine whether such parent can be persuaded to modify his or her harmful conduct. Again, Mahaney has not met this test. On the contrary, the experts who assessed Johnston's current conduct and parenting capabilities gave her positive ratings, and the home study concluded that the children would thrive in her home.

## b. Knowledge of Tribal Customs

■ The guidelines also provide that persons with the following characteristics are "most likely" to qualify as expert witnesses under § 1912(e):

> (i) A member of the Indian child's tribe who is recognized by the tribal community as knowledgeable in tribal customs as they pertain to family organization and childrearing practices.
>
> (ii) A lay expert witness having substantial experience in the delivery of child and family services to Indians, and extensive knowledge of prevailing social and cultural standards and childrearing practices within the Indian child's tribe.
>
> (iii) A professional person having substantial education and experience in the area of his or her specialty.

44 Fed. Reg. at 67,593.

The first two guidelines express a clear preference for

---

[21] Nothing in the record suggests that Johnston's current conduct has caused Natasha to be potentially suicidal. Moreover, Johnston and her husband stand ready to help Natasha work through this serious problem.

expert witnesses familiar with tribal customs for family and childrearing. But in arguing that her experts were qualified under ICWA, Mahaney relies on the third guideline—the only one that does not express a preference for experts with experience and understanding of Native American culture.[22] Her argument is not persuasive.[23]

Mahaney's experts did not testify about Johnston's current conduct or home life to assess how she would care for her children. Nor does it appear that they ever contacted Johnston or visited her home in Alaska. Because they had no firsthand observations of Johnston or her home, they

---

[22] Authorities suggest that absent familiarity with Native American family and childrearing customs, a proposed expert witness is unqualified under ICWA. *See, e.g.,* H.R. REP. No. 1386, 95th Cong., 2d Sess. 22, *reprinted in* 1978 U.S.C.C.A.N. 7545 (stating "[t]he phrase 'qualified expert witnesses' is meant to apply to expertise beyond the normal social worker qualifications"); *State ex rel. Juvenile Dep't v. Charles,* 70 Or. App. 10, 688 P.2d 1354 (1984) (in custody proceeding involving an Indian child, experienced social workers called by the state, who did not possess specialized knowledge of social/cultural aspects of Indian life, were unqualified even though each possessed expertise beyond that of normal social worker).

*See also In re Welfare of Fisher,* 31 Wn. App. 550, 553, 643 P.2d 887 (1982), in which the court found two witnesses qualified: One had been a caseworker supervisor for an Indian Center foster care program for three years; and the other had been a mental health counselor for the Puyallup tribe and had been a foster care caseworker for the Seattle Indian Center for two and one-half years.

[23] The cases Mahaney cites are distinguishable. In each case, the limitation or parental termination supported by expert testimony involved parents who, *at the time of the hearing,* exhibited severe mental problems, drug or alcohol addictions, or were unwilling to comply with a remedial plan. *See In re Oscar C., Jr.,* 559 N.Y.S.2d 431, 147 Misc. 2d 761 (1990) (permanent foster care with grandmother was appropriate because father was diagnosed with acute paranoia and could not care for children); *State ex rel. Juvenile Dep't v. Tucker,* 76 Or. App. 673, 710 P.2d 793 (1985) (expert witness not acquainted with Indian customs nevertheless qualified to testify as to risk of serious emotional harm because cultural bias clearly not implicated and no dispute as to mother's mental illness and its severity); *D.W.H. v. Cabinet for Human Res.,* 706 S.W.2d 840 (Ky. Ct. App. 1986) (failure of experts presented by human resources cabinet not fatal in termination action where parents each had long history of chronic abuse, suicidal tendencies, and failed to avail themselves of services offered by cabinet to prevent breakup of the family). The other cases upon which Mahaney relies have similar facts and are equally distinguishable.

In all of her cited cases, the experts had direct contact with the parent who had obvious ongoing problems that were not subject to a particular cultural bias and posed an ongoing threat of harm. Here, however, the record clearly shows that Johnston does not currently abuse substances, has been sober for many years, has established a stable home, and has complied with all court-ordered requirements for reunification with her children.

could not answer the two basic questions the BIA guideline drafters deemed most pertinent.[24] Nor, for the same reason, could they testify to any observed current parental shortcomings. As such, they were not qualified experts within the meaning of § 1912. In short, Mahaney provided no expert evidence that Johnston's life-style or behavior currently poses a clear and convincing risk of harm to her children.[25]

## B. Trial Court Applied Wrong Standard

The trial court analyzed the competing interests as it would in a non-Indian child custody case, using the state law "best interest of the child" standard[26] and its corresponding preponderance of the evidence standard.[27] But ICWA mandates a different standard: In order to justify placement of the children with Mahaney, the trial court would have had to find by clear and convincing evidence that Johnston posed a danger of harm to the children if they were returned to her custody. The record reflects no such finding.

---

[24] By contrast, Sarah Monkton, who prepared the court-ordered Home Study Report, made face-to-face contact at the Johnstons' home and could testify as to Johnston's current status and the unlikelihood of harm to the children. Moreover, as a tribal family advocate for the Native Village of Eklutna Child Advocacy Center, Monkton also potentially qualifies as an expert for § 1912 purposes under any of the guidelines.

[25] Since her expert witnesses could not testify as to Johnston's current behavior and environment, Mahaney could not provide proof of Johnston's current parental fitness, or lack thereof, because neither she nor her son had visited Johnston in Alaska for years.

[26] RCW 26.10.040 and .100. *See, e.g.,* the substance of the findings, the conclusions themselves, and the court's remarks at the March 29, 1999, oral ruling.

[27] At least three months before trial, the trial court knew that the case involved Indian children. Yet it still failed to apply ICWA standards, instead applying a standard that focused solely on the children's needs. At the hearing on Johnston's posttrial motion for return of her children, the court stated:

In January of 1999, I [found] . . . that the Sitka tribe would not have jurisdiction. And I don't care what Native American tribe it is . . . I found that I would maintain jurisdiction *because of my concern for the safety of the children, for the special needs of the children, and because of the disruption it would cause in the children's lives.*

2 Report of Proceedings at 16-17 (emphasis added).

It was not until the end of the hearing on Johnston's motion to return her children that the trial court acknowledged ICWA's "clear and convincing" standard. Yet the trial court's order contains no mention or application of this standard; nor does the order include any findings entered according to this standard. Moreover, in denying Johnston's motion to return her children, the trial court did *not* rely on ICWA grounds that she posed a clear and convincing threat of harm to her children; nor could the trial court have so relied on the record before us. On the contrary, when the trial court acknowledged the goal of reunification, it commended Johnston's efforts and progress toward resumption of her parental role.

■ Neither the trial court's findings nor the record provides any evidence, let alone clear and convincing evidence, to meet the ICWA § 1912 standard that Johnston poses a likelihood of harm to her children. Because the trial court failed to apply ICWA standards, it committed an error of law. Accordingly, we reverse its denial of Johnston's motion to return custody of her children.

### III. RETURN OF CUSTODY TO JOHNSTON

■ Section 1914 of ICWA provides an alternative basis for reversing the trial court's award of custody to Mahaney and refusal to return custody to Johnston:

> Any Indian child who is the subject of any action for foster care placement, . . . any parent . . . from whose custody such child was removed, and the Indian child's tribe may petition any court of competent jurisdiction to invalidate such action upon a showing that such action violated any provision of sections 1911, 1912, and 1913 of this title.

Under this section, Johnston, as the mother of the children subject to foster care placement with Mahaney, petitioned the trial court to invalidate its March 1999 grant of custody to Mahaney and to order their return to her (Johnston's) custody.[28]

---

[28] Although the children were not "removed" from Johnston as typically happens in a dependency action under RCW 13.34.110, .130, the trial court

Under § 1914, once a parent shows that the provisions of one of the listed sections have not been met, a court must invalidate the prior action.[29] Here, Mahaney's custody action, as conducted, violated § 1912(e) when the trial court failed to grant Johnston's motion for return of her children and to invalidate its prior award of custody to Mahaney. Therefore, § 1914 required the trial court to return the children to Johnston.

We reverse the trial court's denial of Johnston's motion to return her children to her custody.[30] We remand to the trial court to order the return of the children to Johnston's custody if the ICWA standards for their involuntary removal from their mother and placement with a nonparent, as outlined in this opinion, remain unmet.

ARMSTRONG, C.J., and QUINN-BRINTNALL, J., concur.

Review granted at 144 Wn.2d 1016 (2001).

effectively entertained and granted such removal when it granted Mahaney's petition for legal custody of the children over Johnston's objection.

[29] *In re Interest of H.D.*, 11 Kan. App. 2d 531, 729 P.2d 1234, 1241 (1986); *In re L.A.M.*, 727 P.2d 1057, 1060-61 (Alaska 1986); *In re Morgan*, 140 Mich. App. 594, 364 N.W.2d 754, 759 (1985).

[30] Because we reverse the trial court's order as violative of ICWA, we do not address Johnston's additional argument that the trial court effectively terminated her parental rights, without following the statutory procedures of RCW 13.34.180-.210, by allowing the children to stay with Mahaney as long as they want and acknowledging that in so doing, "reunification may never occur."