51 P.3d 776 (2002)
146 Wash.2d 878
In the Interest of Natasha MAHANEY and Jesse Mahaney, minors, Erika Mahaney, Petitioner,
v.
Mark S. Mahaney and Rebecca Johnston, Respondents.
No. 71022-8.
Supreme Court of Washington, En Banc.
Argued October 2, 2001.
Decided July 25, 2002.
*778 Patricia Novotny, Seattle, for Petitioner.
Jennifer Dewald, Portland, for Respondents.
*779 Pamela Gideon, Amicus curiae on behalf of Central Council of Tlingit and Haida Indian Tribes.
*777 IRELAND, J.
Petitioner Erika Mahaney, the non-Indian grandmother of two Indian children who have resided with her since 1992, seeks review of a Court of Appeals' decision which reversed her nonparent custody award under chapter 26.10 RCW, finding that the Indian Child Welfare Act of 1978 (ICWA), 25 U.S.C. §§ 1901-1963, requires a showing of present unfitness to continue placement out of the parent's home and that the expert witnesses were unqualified due to a lack of culturally relevant training or experience. We disagree with the Court of Appeals' interpretation of the ICWA and the Bureau of Indian Affairs (BIA) guidelines. We find that the trial court properly awarded residential custody to the grandmother, but that this matter should be remanded for a transfer to juvenile court for proceedings and services necessary to satisfy the requirements of the ICWA and chapter 13.34 RCW for permanency planning.

FACTS
Mother, Rebecca Johnston, born on April 4, 1968, is a native Alaskan Indian residing in Anchorage, Alaska. She is an enrolled member of the Tlingit-Haida Indian Tribes. She and former boyfriend, Mark Mahaney (a non-Indian), are the biological parents of Natasha and Jesse Mahaney, born in 1988 and 1990.[1] In March 1992, both children began living with their grandmother, Erika Mahaney (Mahaney), after their parents sold the house where the four of them had lived as a family. By September 30, 1993, Johnston and Mark Mahaney executed authorizations for temporary legal custody to Mahaney who then resided in Alaska. According to Johnston and Mahaney, the placement was intended to be temporary, and would allow the parents to reorient their lives. During that time, both parents were abusing alcohol, and they are accused of abusing illegal drugs as well. The children have remained in Mahaney's care for nine years.
Since 1993, the children have lived in Tacoma with Mahaney, and have been raised in their grandmother's Jewish tradition. The children attend Hebrew school and take Yiddish lessons. In fact, Natasha who is described as having blonde hair and blue eyes, describes herself as being Jewish.
At oral argument, the parties stipulated to the fact that Mark Mahaney died in an automobile accident on September 4, 2001.[2] His substance abuse problems are suspected to have continued throughout the time the children have lived with their grandmother.
Johnston now claims to be in a position to offer the children a stable home environment, and she has made several attempts to have the children returned to her over the years. Johnston and Mark Mahaney's relationship terminated shortly after the children were placed with their grandmother. Johnston claims she became substance-free thereafter, and she denies experiencing any relapses since 1993. She has married, claims she is active in her Indian community, and says she has plans to open her own restaurant. Her claimed current situation is contrasted with a past that includes incarceration for driving while intoxicated convictions, allegations of sexual molestation made by her daughter against her, and enabling her younger brother to sexually molest both children. Johnston denies abusing illegal drugs and molesting her children. She does admit to observing her brother engage in inappropriate play with the children, and she asserts she forced him to leave her home because of his conduct. Alaskan authorities did not investigate these claims, and it is unclear whether they were reported. Despite Johnston's life improvements, Mahaney has refused to return the children.
Shortly after assuming care of the children, Mahaney relocated to Tacoma, Washington with them. Mark Mahaney also moved to Washington from Alaska in 1993, and he lived in Olympia for some time. Mahaney and Mark objected to the children *780 receiving telephone calls from Johnston. When Johnston demanded the children be returned to her in Alaska, Mahaney sought and obtained a temporary, nonparental custody order in 1994. Mahaney did not give notice to the court that either the children or their mother were of native Alaskan Indian descent.

PROCEDURAL HISTORY
On July 22, 1994, Mahaney was awarded temporary, nonparental custody by Pierce County Superior Court. In her petition, Mahaney claimed that the children have "special needs" and are in danger if they return to their mother. Mahaney asserted that the children have suffered from, and continue to suffer from, the effects of sexual abuse, domestic violence, general neglect, and abandonment they were exposed to while living in their mother's care.
On March 27, 1995, in response to the temporary award of custody, Johnston filed a pro se objection to the award. She denied allegations that she sexually molested her daughter, and she denied ever abusing illegal drugs. Johnston also explained to the court that her response to the temporary order was delayed because of her "low income and... inability to secure legal representation." Clerk's Papers (CP) at 86. At that time, Johnston did not give notice to the court that she or the children were of native Alaskan Indian descent.
Trial for the third party custody petition did not occur until March 1999 due to additional delays caused by the inability of both parties to retain and keep legal counsel, various motions, and two interventions in the matter filed by the Tlingit-Haida and Sitka Indian Tribes of Alaska.
After a four-day trial, the superior court judge awarded Mahaney residential custody of both children, finding that placement to be in the best interests of the children. In spite of the custody award to Mahaney, the trial judge retained jurisdiction, provided for a 90-day review, and ordered Johnston to engage in remedial services directed toward possible reunification with the children.
The court considered the children's "special needs" as they were causally connected to allegations of past sexual abuse, domestic violence, substance abuse, and essential abandonment by both parents demonstrated in part by the length of time the children have resided with Mahaney. In 1997, experts diagnosed both children as suffering from the effects of fetal alcohol syndrome.
Mahaney's granddaughter, Natasha, has been diagnosed with attention deficit hyperactivity disorder (ADHD), depression, posttraumatic stress disorder, and related behavioral disorders, including impulsivity and poor management of anger. When Mahaney observed and received complaints that Natasha engages in public masturbation, she sought special treatment for this problem. Natasha reported during therapy that her mother taught her to masturbate by sticking her hands in her pants, and commented that "at least [maternal uncle] Chuckie asked me if he could do it." CP at 177.
Mahaney's grandson, Jesse, has been diagnosed with ADHD, depression, defiance, anxiety, and posttraumatic stress disorders. Jesse also exhibits behaviors associated with sexual molestation. He reported that his maternal uncle, Chuckie, touched his genitalia. Jesse has also received therapy. Mahaney asserts that both the children's problems are exacerbated when they are confronted with the possibility of having to return to their mother and Alaska.
The custody award required Johnston to undertake certain steps aimed at possible reunification. Johnston did make earnest attempts to comply with the court's plan. However, telephone contact was made difficult due to the estrangement between Mahaney and Johnston.
On September 29, 1999, Johnston asserted that ICWA governs her custody dispute with Mahaney and that the court's custody order and reunification plan should be vacated for failing to make its findings by clear and convincing evidence as required by the act. The trial court held that the evidence it considered at trial met the clear and convincing standard when viewed retroactively against that standard. On December 3, *781 1999, the trial court denied Johnston's motion. Johnston filed a timely appeal.
Although Johnston appealed, she did not provide a transcript of the four-day trial to the Court of Appeals. The Court of Appeals reviewed the available record, finding that ICWA applied and that the trial court had not met the act's "clear and convincing" evidence standard for proving foster care placement was warranted. In re Interest of Mahaney, 105 Wash.App. 391, 408, 20 P.3d 437 (2001). The Court of Appeals further held that testimony from expert witnesses as to the children's "special needs" did not meet ICWA's guidelines for qualified expert witnesses. Id. at 404, 20 P.3d 437. The Court of Appeals strictly applied ICWA and the BIA guidelines and, finding those standards were not readily met, reversed the trial court's order of custody. Additionally, the Court of Appeals remanded the matter to the trial court to return the children to Johnston's custody "if the ICWA standards for their involuntary removal from their mother and placement with a nonparent, as outlined in this opinion, remain unmet." Id. at 409, 20 P.3d 437.

ISSUES
Whether Washington's "best interest of the child" test applies to a nonparent custody proceeding under RCW 26.10.100 when a custody award to a nonparent is defined as foster care under ICWA. 25 U.S.C. § 1912. If ICWA applies, does the evidence meet the "clear and convincing" standard of ICWA?

ANALYSIS
Standard of Review
Three issues are squarely before this Court. The first two issues are the interrelationship between ICWA and chapter 26.10 RCW and whether the trial court applied the correct standard to the evidence. Both of these issues are questions of law, which are reviewed de novo. Huff v. Budbill, 141 Wash.2d 1, 7, 1 P.3d 1138 (2000). Third, if the court applied the correct standard, whether there is sufficient evidence to meet the standard must be determined. We will not overturn a verdict as long as the record contains "`a sufficient quantity of evidence to persuade a rational fair-minded person of the truth of the premise in question.'" Winbun v. Moore, 143 Wash.2d 206, 213, 18 P.3d 576 (2001) (quoting Canron, Inc. v. Fed. Ins. Co., 82 Wash.App. 480, 486, 918 P.2d 937 (1996)).
Applicable Law
This case involves the interplay of three statutes concerned with the welfare of children: "Nonparental Actions for Child Custody" (Nonparent Custody Act), chapter 26.10 RCW; ICWA, 25 U.S.C. §§ 1901-1963; and the "Juvenile Court Act in Cases Relating to Dependency of a Child and the Termination of a Parent and Child Relationship" (Juvenile Court Act), chapter 13.34 RCW. We examine these statutes in turn to assess their applicability and priority in this case.
A. Nonparent Custody Act
This action was initiated by petitioner Mahaney as a nonparent custody proceeding with jurisdiction pursuant to RCW 26.10.030, premised on the fact that the children were residents of Washington and not in the custody of one of their parents. Notice was duly given to the children's parents.
The Nonparent Custody Act provides that "[t]he court shall determine custody in accordance with the best interests of the child." RCW 26.10.100.
A judge in a family court proceeding can order remedial services, such as parenting classes, evaluations, treatment, and supervised visitation, as a condition to custody or visitation. However, funding is generally the responsibility of the parties. Moreover, other than investigation, there is no casework supervision available for family court matters.
B. ICWA
ICWA was enacted by Congress in 1978 "to protect the best interests of Indian children and to promote the stability and security of Indian tribes." 25 U.S.C. § 1902. The act enabled Congress to express:

*782 its clear preference for keeping Indian children with their families ... and placing Indian children who must be removed from their homes within their own families or Indian tribes. Proceedings in state courts involving the custody of Indian children shall follow strict procedures and meet stringent requirements to justify any result in an individual case contrary to these preferences. The Indian Child Welfare Act, the federal regulations implementing the Act, the recommended guidelines and any state statutes, regulations or rules promulgated to implement the Act shall be liberally construed in favor of a result that is consistent with these preferences.
Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed.Reg. 67585-86 (Nov. 26, 1979) (emphasis added).
Although Natasha and Jesse are eligible for enrollment in Alaska Indian Tribes, and their mother is a Native American, no notice was given to any tribe prior to the temporary order. Subsequently, two Alaska tribes received notice and moved to intervene.
A motion to transfer to tribal court was made. Citing ICWA's exceptions from tribal court jurisdiction, the trial court determined that good cause warranted that the matter remain in the trial court. See 25 U.S.C. § 1911(b). Specifically, because of "concern for the safety of the children, ... [the] special needs of the children, and ... disruption of [the] children's lives" in addition to a guardian ad litem being ordered to appear, the court ordered that the matter stay within state court jurisdiction. CP at 245. See Miss. Band of Choctaw Indians v. Holyfield, 490 U.S. 30, 35-36, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989) (discussing when tribal court jurisdiction over custody matters is automatic). No assignment of error was made to the court's denial of the motion to transfer.
Although the court retained jurisdiction of the case, the trial court acknowledged the applicability of ICWA. The tribes had notice of the nonparent custody petition, but did not appear in the proceeding. At the Court of Appeals, the brief of the Central Council of Tlingit and Haida Indian Tribes was not considered because Washington counsel had not been associated. The Central Council filed an amicus curiae brief with the Supreme Court opposing the petition for review.
Johnston initially voluntarily placed the children with Mahaney, and they have resided with Mahaney since 1992. This is not a case where the children are being removed from a parent. Nonetheless, Johnston opposed the custody action and demanded return of the children to her custody. Because the children were in custody where they were not returnable to Johnston on demand, their placement with their grandmother, Mahaney, amounted to foster care placement under ICWA.
ICWA defines foster care placement as "any action removing an Indian child from its parent ... for temporary placement in a foster home or institution or the home of a guardian or conservator where the parent... cannot have the child returned upon demand, but where parental rights have not been terminated." 25 U.S.C. § 1903(1)(i).[3]
Pursuant to ICWA, any unmarried person under the age of 18 who belongs to an Indian tribe or is eligible for membership, and who is the biological child of a member of an Indian tribe, is an "Indian child" under the act. 25 U.S.C. § 1903(4). It is uncontroverted that the children involved here are "Indian children" because their biological mother is a member of the Tlingit-Haida Indian Tribes.[4]
Under ICWA, "[n]o foster care placement may be ordered ... in the absence of a *783 determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent ... is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(e).
Where foster care placement is ordered by a court, the statute gives preference to a member of the child's extended family and makes no reference to the Native American status of such family member. 25 U.S.C. § 1915(b)(i). Thus, Mahaney is first among the preferred placement alternatives for foster care under ICWA.
When foster care placement is ordered under ICWA, remedial services and rehabilitative services designed to prevent the break up of the Indian family must be offered, and the court must be satisfied that these efforts have proved unsuccessful. 25 U.S.C. § 1912(d).
ICWA applies to the matter before us.
C. Juvenile Court Act
The Juvenile Court Act declares the family unit to be a fundamental resource of American life which should be nurtured "unless a child's right to conditions of basic nurture, health, or safety is jeopardized." RCW 13.34.020. The legislature has further declared:
When the rights of basic nurture, physical and mental health, and safety of the child and the legal rights of the parents are in conflict, the rights and safety of the child should prevail.... The right of a child to basic nurturing includes the right to a safe, stable, and permanent home and a speedy resolution of any proceeding under this chapter.
Id.
Under RCW 13.34.040, any person may file a petition concerning a dependent child. A dependent child is defined as any child who:
(a) Has been abandoned;
(b) Is abused or neglected as defined in chapter 26.44 RCW by a person legally responsible for the care of the child; or
(c) Has no parent, guardian, or custodian capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development.
RCW 13.34.030(5).
"`Abuse or neglect' means the injury, sexual abuse, sexual exploitation, negligent treatment, or maltreatment of a child by any person under circumstances which indicate that the child's health, welfare, and safety is harmed...." RCW 26.44.020(12).
The Juvenile Court Act also provides for services to dependent children and their parents. RCW 13.34.030(12). A dispositional order under the statute may provide for services to a child who is to be returned to a parent "to alleviate the immediate danger to the child, to mitigate or cure any damage the child has already suffered, and to aid the parents so that the child will not be endangered in the future." RCW 13.34.130(1)(a).
Services must also be provided to a child and parent where such child is not in the parent's custody to ensure the safety of the child and reunification with the parent. RCW 13.34.030(14), .110, .130.
Application
Although a four-day trial was held on the petition for nonparent custody, Johnston had only the court's oral ruling following trial and the court's oral ruling on the motion for reconsideration transcribed for appeal. Although the record contains clerk's papers and exhibits, including medical reports, psychological evaluations, home studies, and the report of the guardian ad litem, what the trial court heard in testimony is unavailable for review.
ICWA identifies three specific requirements for finding that foster care placement of Indian children is warranted. In pertinent part, it provides:
No foster care placement may be ordered in such proceeding in the absence of a determination, supported by [1] clear and convincing evidence, including [2] testimony of qualified expert witnesses, that [3] the continued custody of the child by the *784 parent or Indian custodian is likely to result in serious emotional or physical damage to the child.
25 U.S.C. § 1912(e).
The BIA has promulgated guidelines for ICWA. These guidelines state as follows:
To be clear and convincing, the evidence must show the existence of particular conditions in the home that are likely to result in serious emotional or physical damage to the particular child who is the subject of the proceeding. The evidence must show the causal relationship between the conditions that exist and the damage that is likely to result.
Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed.Reg. 67593 (Nov. 26, 1979).
The Court of Appeals relied on this provision to reverse the trial court's nonparent custody order:
In determining whether the parent poses a risk of harm to the child, the focus [of the guidelines] is clearly on the parent and his or her present fitness to care for the children in question.
But Mahaney's expert witnesses focused exclusively on the children, their reaction to experiences with their mother and her companions in years past, and their anxiety about leaving their grandmother in Tacoma and returning to their mother in Alaska. Thus, Mahaney's experts do not meet the statutory requirement of assessing current parental fitness.
Mahaney, 105 Wash.App. at 404, 20 P.3d 437.
This strict reading of the guidelines is at odds with the special circumstances of this case. This is not a removal case because the children have been out of their mother's custody since 1992. Furthermore, an interpretation restricting the reason for continued placement out of the home to present parental unfitness exceeds the scope and purpose of the guidelines themselves. These are guidelines rather than regulations, and guidelines do not have the effect of law:
Although the rulemaking procedures of the Administrative Procedures Act have been followed in developing these guidelines, they are not published as regulations because they are not intended to have binding legislative effect....
Where Congress expressly delegates to the Secretary the primary responsibility for interpreting a statutory term, regulations interpreting that term have legislative effect. Courts are not free to set aside those regulations simply because they would have interpreted that statute in a different manner. Where, however, primary responsibility for interpreting a statutory term rests with the courts, administrative interpretations of statutory terms are given important but not controlling significance.

Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed.Reg. 67584 (Nov. 26, 1979) (emphasis added).[5]
In this case, ICWA does not replace the best-interests test of RCW 26.10.100, but merely requires that the foster care finding be made by clear and convincing evidence. See In re D.S.P., 166 Wis.2d 464, 480 N.W.2d 234 (1992) (holding that Wisconsin could prove abandonment by clear and convincing standard of state statute so long as ICWA standard of beyond a reasonable doubt was applied to the issue of termination).
Both federal and Washington law are settled that court proceedings deciding matters of child custody should aim to protect the child's best interests. Our ruling is consistent with the opinions of other jurisdictions. See In re Maricopa County Juvenile Action No. A-25525, 136 Ariz. 528, 667 P.2d 228 (Ariz.Ct.App.1983) (interpreting legislative intent of ICWA); In re Santos Y., 112 Cal.Rptr.2d 692, 92 Cal.App.4th 1274, (2001) (emphasizing that ICWA was enacted to protect Indian children); In re TM, 245 Mich.App. 181, 628 N.W.2d 570 (2001) (citing 25 *785 U.S.C. § 1902 which describes the legislative purpose behind ICWA). Thus, the fact that ICWA applies should not signal to state courts that state law is replaced by the act's mandate. Well-established principles for deciding custody matters should further the act's goals. "Congress did not intend `to oust the States of their traditional jurisdiction over Indian children falling within their geographic limits'" through enacting ICWA. Holyfield, 490 U.S. at 58, 109 S.Ct. 1597 (quoting H.R.Rep. No. 95-1386, at 19 and citing 1978 U.S.C.C.A.N. 7541).
Even where there is no showing of present parental unfitness, in determining the best interests of the child the court may take into consideration emotional and psychological damage from prior unfitness of a parent and the child's current special needs for treatment and care. Moreover, in the case before us, the court is entitled to examine the lack of a bond to the parent and the presence of a bond to the children's grandmother, who has been their parent figure for most of their lives. It is clear from the record that the trial court made such an examination in this case.
At the nonparent custody trial, the court found the following facts:
The child is not in the physical custody of one of its parents.
Neither parent is a suitable custodian for the following reasons:
1. The father abandoned the children for an extended period of time.
2. The father is unable and unwilling to act as the children's primary care provider.
3. The mother is not presently able to address the children's special medical and psychological needs.
4. The mother and father have engaged in behavior with the children that has had a negative effect on the children's development and growth.
The court's conclusions concerning the best interests of the children are based on the following facts:
1. The children have been in the physical custody of Erika Mahaney, the paternal grandmother, since 1992. The father has engaged in willful abandonment of the children for the past six plus years.
2. Both parents abused alcohol and illegal drugs when the children resided with the parents. Further, the mother's family did physically and sexually abuse the children while in the mother and father's care.
3. The parents have a history of acts of domestic violence.
4. The parents have a history of drug and alcohol abuse that has severely impaired their ability to perform parenting functions.
5. The children have established a maternal/parenting bond with Erika Mahaney, the paternal grandmother.
6. It is in the best interest of the children that Erika Mahaney retain custody of the children.
With the exception of finding 6, which is more properly characterized as a conclusion of law, these findings are unchallenged on appeal. Unchallenged findings are treated as verities on appeal. State v. Ross, 141 Wash.2d 304, 309, 4 P.3d 130 (2000).
Furthermore, in custody and foster care proceedings concerning child welfare, the trial court is accorded broad discretion and is entitled to great deference on review. In re Dependency of Roberts, 46 Wash.App. at 752, 732 P.2d 528. Such deference to the trial court, which has the witnesses before it, is especially important in child welfare cases. Id. In this case, particularly in the absence of a record of the testimony, the challenge to the sufficiency of the evidence on appeal must fail.
In spite of the award of custody to Mahaney, the court retained jurisdiction and ordered the mother to engage in services directed toward a reunification plan, including completing a home study, parenting classes, and drug and alcohol abuse counseling. By separate order, the court provided that "this matter shall be revisited on January 7th 2000." CP at 266. The order clearly contemplates a review following the mother's participation in services.
On September 29, 1999, prior to the scheduled January 7, 2000 hearing, Johnston *786 filed a notice of withdrawal of consent for temporary custody filed on September 30, 1993. Contemporaneously, she filed a motion for return of the children under ICWA. The motion set forth the argument that ICWA requires a showing of present parental unfitness for foster care placement and that the court had failed to make its findings by ICWA's required standard of clear and convincing evidence.
Johnston's motion for return of the children under ICWA was heard on December 3, 1999. The findings and conclusions of July 9, 1999 did not reference the standard of proof utilized by the court. The first time that counsel for Johnston had requested that the appropriate standard of proof be clear and convincing evidence was in the motion for return of the children:
[THE COURT]: At the time of my ruling [in March 1999] and in terms of the trial, I think it was unclear on Counsel's part, both from Mrs. Johnston and Ms. Mahaney, what the standard of proof was. So there was a compromise there, and I made findings on what we all understood to be the standard of proof. But if you're telling me that now the standard of proof is clear and convincing evidence, I will tell you, retroactively, that I will find clear and convincing evidence that custody of the children needs to stay with Ms. Mahaney.
The reason for that is because of the overwhelming clear and convincing evidence that Mrs. Johnstonthat transferring custody to her would likely result in serious emotional and potentially physical damage to the children. There was overwhelming testimony at the trial, absolutely overwhelming, that these children would be emotionally traumatized, if not completely suicidal, if they were transferredif their custody was transferred.
Report of Proceedings (Dec. 3, 1999) at 17.
Johnston cites no authority for her contention that failure to request a standard of proof at trial precludes the court from retroactively applying that standard. The court applied the clear and convincing standard of proof retroactively.
In line with ICWA's clear and convincing evidence requirement, such evidence is to be supported by testimony from "qualified experts." 25 U.S.C. § 1912(e). Experts under ICWA have been generally qualified through their "special knowledge of and sensitivity to Indian culture." State ex rel. Juvenile Dep't of Multnomah County v. Cooke, 88 Or.App. 176, 744 P.2d 596, 597 (1987). "The use of the plural form, `expert witnesses,' in the ICWA does not mean, however, that the testimony of more than one qualified expert is required." In re the Dependency of Roberts, 46 Wash.App. 748, 755, 732 P.2d 528 (1987) (citing D.A.W. v. State, 699 P.2d 340, 342 (Alaska 1985)). In fact, ICWA has been interpreted to allow some latitude where experts are concerned. When expert testimony is offered that does not inject cultural bias or subjectivity, courts have held that no "special knowledge of Indian life" is required. State ex rel. Juvenile Dep't of Lane County v. Tucker, 76 Or App. 673, 683, 710 P.2d 793 (1985).
In Tucker, the Oregon Court of Appeals decided a termination of parental rights matter involving an Indian mother who admitted that her emotional and mental conditions disabled her from adequately caring for her children. The court held that where the issue was whether continued custody by the mother would result in serious emotional harm to the child due to the mother's mental illness, and where there was no dispute about the mother's condition or its severity, the State was not required to present expert witnesses possessed of special knowledge of Indian life to establish that the mother's continued custody would be likely to result in serious emotional or physical damage. Id.
In the instant case, the court was entitled to rely on the expert witnesses with specialized training for the medical, psychological, and special needs of the children, even though such experts lack special knowledge of and sensitivity to Indian culture. Determining the admissibility of expert opinion is within the discretion of the trial court. Roberts v. Atl. Richfield Co., 88 Wash.2d 887, 898, 568 P.2d 764 (1977).
*787 Award Justified
Having determined that the trial court properly utilized the best interests of the child standard, and that qualified expert witness testimony supports its decision, the challenge to the sufficiency of the evidence must fail. The court reviewed the evidence previously heard utilizing the clear and convincing standard. We are not privy to all the court's evidence because Johnston did not provide a transcript of the trial, which is her obligation when challenging sufficiency. However, even on the basis of information contained in the records available, the evidence is sufficient to support the court's award.
Juvenile Court Transfer
Having found that the court properly awarded nonparent custody in this case, there still remains the need, recognized by the court, for resolution of Johnston's contact with the children and the need for services to Johnston and the children directed toward reunification or a determination of Johnston's future role in the children's lives. Whether or not the children would be found to be dependent under RCW 13.34.020 is debatable since they presently have a custodian capable of adequately caring for them. However, they are considered to be in foster placement under ICWA. Accordingly, this matter should be transferred to juvenile court for provision of services and proceedings as though the children were dependent. Both ICWA and Washington's juvenile code place priority on permanency planning.
This transfer will also enable all parties, including the children, to have counsel, and will afford the opportunity for casework and other services as necessary to assist this family.

CONCLUSION
The decision of the Court of Appeals is reversed, and the matter is remanded to superior court to be transferred to juvenile court for proceedings consistent with dependency under RCW 13.34.020 and foster care under ICWA.
ALEXANDER, C.J., SMITH, MADSEN, SANDERS, BRIDGE, OWENS, JJ., concur.
CHAMBERS, J. (dissenting).
I respectfully dissent. I sympathize with my colleagues' desire to keep the Mahaney children with their paternal grandmother who has nurtured and protected them and provided them with a stable environment since 1993. It is, however, incumbent on this Court to enforce the laws of the United States. While the majority would apply the Washington standard of best interests of the children and would transfer the case to juvenile court, I would remand to superior court with an order for a new trial for the court to apply the standards of the Indian Child Welfare Act of 1978 (ICWA), 25 U.S.C. §§ 1901-1963.
The welfare of a child must necessarily be considered in the context of the relevant family structure and cultural background. See DeCoteau v. Dist. County Court, 420 U.S. 425, 465, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975) (Douglas, J., dissenting). Native American culture is not well understood by our administrative agencies and courts and there is an inherent bias in favor of non-Native American values and therefore non-Native American placement. The consistent failure of state agencies to recognize the unique characteristics of Native American culture and shocking statistics indicating wholesale and often unwarranted removals of Native American children from their families and tribal communities,[1] led Congress to adopt the ICWA in 1978. The ICWA was an effort by Congress to reverse the tradition of taking Native American children away from their parents and tribes for the "best interest" of the children based upon non-Native American values. Those children, Congress concluded, were deprived of the religious, *788 linguistic, ancestral, educational, and traditional influences of the native tribes. This trend threatens the existence of Native American culture. As the numbers of the tribal community dwindle, the Native American culture also dwindles. The purpose of the ICWA is to preserve Native American tribes by establishing standards to protect Native American children and keep them within their families, communities, and tribes whenever possible.[2] With this legislative background in mind, let us examine the facts before us.
Rebecca Johnston, a registered member of the Tlingit and Haida tribes, and Mark Mahaney had two children, born in 1988 and 1990. The children were eligible for membership in the Tlingit, Haida, and Sitka tribes. In 1992, both parents signed a consent form to give temporary legal custody of the children to the paternal grandmother, Erika Mahaney (Mahaney). At the time temporary custody was granted, all three lived in Alaska, but shortly thereafter Mahaney relocated with the children to Tacoma, Washington. The arrangement continued amicably until May 1994, when Johnston called to say she wanted to have the children return to live with her. As a result of that telephone call, Mahaney filed for third party custody in Pierce County, Washington. The petition did not state that the children were of Native American origin. Johnston, unable to afford a lawyer, failed to respond, so a default order was entered granting custody to Mahaney. Johnston subsequently revoked her consent to temporary custody.
In May 1998, the Sitka tribe filed a notice of intervention in Pierce County Superior Court. A report by the court appointed guardian ad litem noted that the mother was now clean and sober but nevertheless suggested that the children remain with their grandmother. In November, the Haida and Tlingit tribes filed a joint notice of intervention. Johnston then moved for transfer to tribal court, but the superior court denied the motion and held that the best interests of the children would be to stay with the grandmother, citing concern for the safety of the children, the special needs of the children, and disruption to the children's lives by a return to their mother. In March 1999, the case proceeded to trial. Mahaney called experts who testified about the children's bad experiences with their mother in the past and their anxiety about returning to their mother's custody. The experts did not visit Johnston and offered no testimony about her home life or parenting ability. The court awarded temporary custody to Mahaney and ordered a reunification plan. Johnston met all the requirements ordered by the court as part of the reunification plan, including parenting classes, counseling, classes to assist in reunification, and providing the children with information about their Native American heritage. She also abided by the court's direction to allow the children's counselor to control her telephone contact with the children and to consult with the children's counselor before any unsupervised contact with the children.
A home study conducted by the tribe in 1999 found that the Mahaney children are likely to thrive if returned to the mother, who has since remarried and has developed a strong support network. The study described the mother as "consistently friendly, as well as responsible and motivated to accomplish any task necessary to improve the life of her and her family." Clerk's Papers at 100. Johnston and her husband have sufficient financial resources to care for the children, have access to free medical services, and are committed to allowing the children access to the Jewish culture in which their grandmother had raised them as well as to Native American culture.
After the home study report was issued, Johnston again formally revoked her consent to temporary custody, and she moved for immediate return of her children pursuant to the ICWA. The children have stated that they do not want to live with their mother because they do not know her and they have bad memories of life with her when they *789 were little. On the other hand, the home study report indicates that Johnston is committed to obtaining family therapy with the Alaska Native Medical Center to address these issues.
The ICWA imposes minimum requirements, and the parties do not dispute its applicability. Under the ICWA, a state court may not order foster[3] placement of Native American children in an involuntary proceeding unless it determines "that the continued custody of the child by the parent... is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(e): This standard focuses its attention on the parent and is thus very different from the "best interests of the child" standard used by the trial court.
The majority, however, would adhere to the best interests of the child standard, modified only slightly to take into account the strictures of the ICWA by a requirement that the "foster care finding be made by clear and convincing evidence." Majority at 784.[4]
The majority's emphasis on the best interest of the children is laudable, but results in the court's doing precisely what the ICWA was designed to prevent: it applies non-Native American values with little appreciation for the value of Native American tribes, their culture, and their influence. Here, the issue is not whether parental rights should be terminated, but whether the children should remain with their grandmother while appropriate steps were taken toward reunification with their mother. Any determination that the children would be seriously harmed by a return to Johnston's custody must be supported by clear and convincing evidence. 25 U.S.C. § 1912(e). This evidence must show the existence of particular conditions in the home and the causal relationship between those conditions and the damage that is likely to result. Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed.Reg. 67,583 (Nov. 26, 1979). No such evidence was presented. On the contrary, Johnston's home study provided a very positive report, concluding that the children would thrive in her home.
The majority is wrong in concluding that the best interests of the child must be found by clear and convincing evidence. Clear and convincing evidence must support a finding of parental unfitness to care for the child. 25 U.S.C. § 1912(e).
Part of the evidence required by the ICWA is testimony of qualified expert witnesses. The guidelines express a preference for a tribal member or a lay expert knowledgeable about tribal customs as they pertain to family organization and child rearing practices. 44 Fed.Reg. at 67,593. The third choice is "[a] professional person having substantial education and experience in the area of his or her specialty." Id. at D.3 commentary (b)(iii). Mahaney relies on this category to argue that the experts who testified on her behalf regarding the children's special needs were sufficiently qualified. However, case law suggests that an expert in this third category needs to have "`expertise beyond the normal social worker qualifications.'" State ex rel. Juvenile Dep't of Multnomah County v. Charles, 70 Or.App. 10, 17, 688 P.2d 1354 (1984) (holding that social workers with more than normal experience but without specialized tribal and cultural knowledge were unqualified under the ICWA).
Only when cultural bias is clearly not implicated and when there is no dispute about the parental inadequacy at the time of the *790 hearing is a social worker without such cultural expertise acceptable. See, e.g., State ex rel. Juvenile Dep't of Lane County v. Tucker, 76 Or.App. 673, 683-84, 710 P.2d 793 (1985) (allowing testimony from a worker without cultural expertise when there was no dispute about risk to the children because of the mother's mental illness); In re Oscar C., Jr., 147 Misc.2d 761, 763-64, 559 N.Y.S.2d 431 (1990) (allowing such testimony where the father was clearly unable to care for the children because of a diagnosis of acute paranoia). Here, in contrast, the 1999 home study indicates that the mother is ready and able to receive the children.
No party assigned error to the failure to transfer to tribal court. I would therefore remand to superior court for a new trial with directions to the court to base its decision on whether there is clear and convincing evidence that returning the children to the mother's custody would result in serious harm, as is required by the ICWA.
I respectfully dissent.
JOHNSON, J., concurs.
NOTES
[1] Prior to giving birth to Natasha and Jesse, Rebecca Johnston placed two sons with another tribal member for open adoption.
[2] A letter concerning Mark Mahaney's death was submitted to this Court by his brother, Richard Mahaney. Both Johnston and Erika Mahaney moved to strike the letter. The motion was granted.
[3] See D.E.D. v. State, 704 P.2d 774, 780 n. 10 (Alaska 1985) (when an Indian child is not returned to his or her parent at the conclusion of a voluntary placement, the subsequent proceedings affirming that placement changes the nature of the placement from "voluntary" to "involuntary").
[4] Mahaney underscores that the children were not declared as eligible for enrollment in the Tlingit-Haida Indian Tribe until 1998. However, "[e]nrollment is the common evidentiary means of establishing Indian status, but it is not the only means nor is it necessarily determinative" of Indian heritage under the Act. Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed.Reg. 67586 (Nov. 26, 1979).
[5] See In re Dependency of Roberts, 46 Wash.App. 748, 752-53, 732 P.2d 528 (1987), which holds that when an Indian child is subject to a termination proceeding, 25 U.S.C. § 1912(f) does not replace RCW 13.34.180, but merely imposes an additional burden on the State (where termination was sought) to prove beyond a reasonable doubt that continued custody by the parent "`is likely to result in serious emotional or physical damage to the child.'"
[1] The statistical data and expert testimony presented in an early senate oversight hearing held in 1974 include a comment by one witness, William Byler, that current practices were akin to "`[t]he wholesale removal of Indian children from their homes.'" Missi. Band of Choctaw Indians v. Holyfield, 490 U.S. 30, 32, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989) (quoting testimony of Byler).
[2] The sponsor of the legislation, Representative Morris Udall, summarized the four years of congressional hearings, oversight, and investigation "has disclosed a serious problem in Indian child welfare which approaches crisis proportions." 124 Cong. Rec. 38102 (1978) (statement of Rep. Morris Udall).
[3] The ICWA defines foster care as "any action removing an Indian child from its parent ... for temporary placement in a foster home ... where the parent ... cannot have the child returned upon demand, but where parental rights have not been terminated." 25 U.S.C. § 1903(1)(i). Under this definition, Mahaney is providing foster care to the children.
[4] For this proposition, they cite a Wisconsin case that upheld a dual standard of proof for cases decided under the ICWA. In re D.S.P., 166 Wis.2d 464, 472-75, 480 N.W.2d 234 (1992). In D.S.P., the court found that although the ICWA standard of beyond a reasonable doubt should be applied to the issue of whether parental rights should be terminated, additional protections offered in the Wisconsin children's code should also be applied. The court thus held that as an additional protection, whether abandonment had actually occurred, should also be shown by the Wisconsin standard of clear and convincing evidence. Id. at 472-75, 480 N.W.2d 234.