# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Guardianship of | DIVISION ONE |
| S.H.-R.,<br>DOB: 11/06/09, | No. 75025-9-I |
| ANJULI J. HAMMOND, | UNPUBLISHED OPINION |
| Appellant, | |
| v. | |
| DEPARTMENT OF SOCIAL AND<br>HEALTH SERVICES, | |
| Respondent. | FILED: March 27, 2017 |

DWYER, J. — Anjuli Hammond appeals from a trial court's order granting the Department of Social and Health Services' petition to establish a guardianship for Hammond's six-year-old son, S.H.-R. Hammond contends that the trial court erred by finding that the Department had made active but unsuccessful efforts to provide remedial services aimed at preventing the breakup of the family. Hammond also contends that the trial court's other findings of fact are not supported by substantial evidence. Finding no error, we affirm.

I

Hammond was between four- and six-years-old, homeless, and malnourished when her two mothers adopted her from India. Since her adoption, Hammond has suffered with emotional and behavioral difficulties, developmental delays, hearing and vision problems, and substance abuse. S.H.-R.'s father, Brenton Rosario, was only fleetingly involved in S.H.-R.'s life, has a history of homelessness, sexual abuse, drug and alcohol abuse, and has an adult and juvenile criminal record. Rosario is not a party to this litigation.

S.H.-R. was born prematurely in 2009 and the Department received an at-risk referral from the hospital following his birth. The Department contacted Hammond, who agreed to accept in-home services and the assistance of a public health nurse, as well as to resume the counseling and medication management that she had discontinued during her pregnancy. Two years later, the Department received a neglect referral stating that Hammond's home was dirty and presented a safety hazard to her son because there were cleaning products, knives, and coins within S.H.-R.'s reach. The Department offered Hammond in-home services to address these issues but Hammond refused. The Department later closed this inquiry when it determined that the home's cleanliness had improved.

In February of 2012, Bellingham Police received an emergency telephone call reporting that Hammond was seen in public screaming at S.H.-R. and forcing him to walk. The responding officer observed Hammond dragging S.H.-R. and shouting at him. Hammond was uncooperative with the responding officer but

was able to calm down after 10 minutes and return home. The following month, Hammond was detained by police and taken to a hospital due to agitated psychotic behavior. The police observed Hammond speaking unintelligibly, running around her parking lot barefoot, pounding on car windows, banging her head on the floor, and forcing her crying son to lay down on the floor. The Department received a referral and determined that "the child is in imminent risk which requires his removal from the parent's home."

Hammond was released into the custody of her parents. A Department social worker contacted her the following day. The social worker observed that Hammond was unstable, angry, abusive, and unable to focus. The social worker observed Hammond shouting, banging her hand on the table, throwing small objects, and expressing frustration at being a single parent and being unable to cope with her daily life. Hammond agreed to allow her parents to continue caring for S.H.-R. The Department subsequently filed a dependency petition.

Hammond has struggled with domestic violence for years, both as a victim and as a perpetrator. Hammond has been involved in several physical confrontations with her boyfriend, David Maier, which culminated in a court order prohibiting Hammond from contacting Maier. Hammond has violated this no-contact order on at least two occasions. Hammond briefly stayed at a domestic violence shelter but was forced to leave after it was discovered that she voluntarily remained in contact with Maier during her stay.

In June of 2012, Hammond agreed to a court order establishing dependency over S.H.-R. and maintaining him in his grandmothers' care. The

order stated that the Department had engaged in active efforts by actively working with the parents to "engage them in remedial services and rehabilitative programs to prevent the breakup of the Indian family . . . but those efforts have been unsuccessful."[1] The order required that Hammond obtain psychological and drug and alcohol assessments, submit to random drug screenings, complete an anger management assessment, follow through with mental health counseling and medication management, and maintain a safe, stable, and sober house free of domestic violence and criminal activity, among other measures.

Hammond had limited success in complying with the court's dependency order. At the first dependency review hearing, the court found that Hammond had been noncompliant with all but one of the ordered services. At the permanency planning hearing, the court found that Hammond was partially compliant with some of the measures ordered by the court—completing her drug and alcohol evaluation and attending one full day of a psychological evaluation—but was noncompliant with all other measures.

At the second dependency review hearing, the court found that Hammond was compliant with some measures, but only partially compliant or noncompliant with other measures. The court determined that Hammond successfully followed through with all recommendations from her substance evaluation, completed a domestic violence assessment, followed through with recommendations from the psychological assessment, and completed a parenting evaluation. However, the

---

[1] S.H.-R.'s father, Rosario, is a member of the Lummi Nation and the Lummi Nation recognizes S.H.-R. as a member.

court also found that Hammond failed to appear for 11 separate drug screenings, failed to maintain a sober lifestyle, failed to maintain safe and stable housing, violated her no-contact order with Maier, and failed to maintain regular contact with her social worker.

In 2013, the Department filed a petition to establish a guardianship with S.H.-R.'s maternal grandmothers as his guardians. The petition was granted following a trial. Hammond then moved for reconsideration, asserting that the Department had failed to engage in "active efforts" to prevent the breakup of the Indian family. The motion for reconsideration was denied. Hammond timely appealed.

## II

We review a trial court's factual findings in support of an order establishing a guardianship for substantial evidence. In re Welfare of A.W., 182 Wn.2d 689, 711, 344 P.3d 1186 (2015). Substantial evidence exists so long as a rational trier of fact could find that the necessary facts were proved by a preponderance of the evidence. A.W., 182 Wn.2d at 711. Because the trial court is in the best position to hear testimony and observe witnesses, we do not decide the credibility of witnesses or weigh the evidence. In re Dependency of A.V.D., 62 Wn. App. 562, 568, 815 P.2d 277 (1991).

A guardianship may be established when the court finds by a preponderance of the evidence that it is in the child's best interest to establish a guardianship and

> (i) The child has been found to be a dependent child under RCW 13.34.030;

(ii) A dispositional order has been entered pursuant to RCW 13.34.130;

(iii) At the time of the hearing on the guardianship petition, the child has or will have been removed from the custody of the parent for at least six consecutive months following a finding of dependency under RCW 13.34.030;

(iv) The services ordered under RCW 13.34.130 and 13.34.136 have been offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been offered or provided;

(v) There is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future; and

(vi) The proposed guardian has signed a statement acknowledging the guardian's rights and responsibilities toward the child and affirming the guardian's understanding and acceptance that the guardianship is a commitment to provide care for the child until the child reaches age eighteen.

RCW 13.36.040(2)(c).

## A

Hammond first contends that the trial court erred by finding that the Department had engaged in active efforts to offer her remedial services and by finding that those efforts were unsuccessful. This is so, she asserts, because the trial court failed to hold the Department to the correct legal standard. We disagree.

S.H.-R. is a member of the Lummi Nation and is an Indian child as defined by the Indian Child Welfare Act, 25 U.S.C. § 1901 (ICWA), and the Washington State Indian Child Welfare Act, chapter 13.38 RCW (WICWA).[2] In addition to the statutory factors required to establish a guardianship pursuant to RCW

---

[2] The fact that Hammond herself is not an Indian as defined by ICWA or WICWA is immaterial to a finding that those acts apply. In re Adoption of T.A.W., 186 Wn.2d 828, 847, 383 P.3d 492 (2016).

- 6 -

13.36.040(2), the removal of an Indian child requires that the Department show by clear, cogent, and convincing evidence that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." 25 U.S.C. § 1912(d); RCW 13.38.130; see, e.g., In re Dependency of A.M., 106 Wn. App. 123, 130-31, 22 P.3d 828 (2001).

ICWA does not define "active efforts." However, WICWA provides that active efforts are demonstrated through a showing that the Department "actively worked with the parent, parents, or Indian custodian to engage them in remedial services and rehabilitation programs to prevent the breakup of the family beyond simply providing referrals to such services." RCW 13.38.040(1)(a)(i)-(iii).[3] ICWA and WICWA are read as "coextensive[,] barring specific differences in their statutory language." In re Adoption of T.A.W., 186 Wn.2d 828, 844, 383 P.3d 492 (2016).

---

[3] Although no federal regulation defined "active efforts" at the time of trial, the Bureau of Indian Affairs has since defined the term to mean:

> [A]ffirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family. Where an agency is involved in the child-custody proceeding, active efforts must involve assisting the parent or parents or Indian custodian through the steps of a case plan and with accessing or developing the resources necessary to satisfy the case plan. To the maximum extent possible, active efforts should be provided in a manner consistent with the prevailing social and cultural conditions and way of life of the Indian child's Tribe and should be conducted in partnership with the Indian child and the Indian child's parents, extended family members, Indian custodians, and Tribe. Active efforts are to be tailored to the facts and circumstances of the case.

Indian Child Welfare Act Proceedings, 81 Fed. Reg. 38,778 (June 14, 2016) (to be codified at 25 C.F.R. pt. 23, subpt. I).

The record shows that this definition—which was proposed at the time but not effective—was not brought to the trial court's attention until the posttrial motion for reconsideration. We do not further consider it in resolving the issues presented herein.

Hammond contends that the active efforts requirement found in ICWA and WICWA imposes a higher standard on the Department than applies in non-ICWA matters. To support this contention, Hammond cites T.A.W.

In T.A.W., our Supreme Court noted that "[w]hen an Indian child is at issue, ICWA and WICWA impose more exacting requirements than a typical termination proceeding." 186 Wn.2d at 841. Addressing the "active efforts" requirement specifically, the court stated that "ICWA . . . does not define 'active efforts,' nor does it indicate the requisite amount of services required before the termination of parental rights may occur." T.A.W., 186 Wn.2d at 842.

Contrary to Hammond's assertion, T.A.W. does not stand for the proposition that "active efforts" constitute a more exacting requirement. Rather, in addressing the "higher burden of proof" contemplated by ICWA, the court pointed to the requirement that courts make a determination that the continued custody of the child by the parent is likely to result in serious emotional or physical damage to the child—a determination not required in non-ICWA matters. 25 U.S.C. § 1912(f); T.A.W., 186 Wn.2d at 842.

The Supreme Court's decision in T.A.W., as it relates to the active efforts requirement specifically, was limited to the determination of whether private parties were required to prove that active efforts were made. In answering in the affirmative, the court did not characterize the active efforts requirement itself as a heightened standard. T.A.W., 186 Wn.2d at 853-54. Rather, the higher standard found in ICWA relates to *who* must prove active efforts—"*Any* party"—not what those efforts must involve. T.A.W. 186 Wn.2d at 842.

In any event, the trial court herein demonstrated its understanding of the active efforts requirement and substantial evidence supports the trial court's finding that the Department did engage in active efforts to offer remedial and rehabilitative services and that those efforts were unsuccessful.

The trial court heard testimony regarding the Department's efforts from Tony Loya, the Department's primary caseworker assigned to S.H.-R. Loya testified that he worked with Hammond to identify and correct her parental deficiencies. Loya testified that the Department had completed a psychological evaluation of Hammond and had recommended related services, but that Hammond largely failed to comply with or complete most of the services. Loya testified that, although Hammond always expressed a willingness to do whatever was needed to get her son back, she could not establish any sort of consistency with the most basic of services that the Department requested.

Loya testified that the Department had concerns that Hammond was abusing drugs and alcohol and had asked her to complete a substance abuse evaluation. Hammond completed the evaluation and it was determined that she was not in need of further substance abuse treatment. Loya testified that the Department referred Hammond for a domestic violence evaluation, both for perpetrating domestic violence and for being a victim of domestic violence. The Department requested that Hammond remain in mental health therapy after her evaluation.

Loya testified that the Department experienced great difficulty in working with Hammond between 2012 and 2013. Loya testified that Hammond was

noncompliant with requests by supervisors during visits with her son and that she largely refused to participate in drug screenings, making it impossible for the Department to establish long-term sobriety.[4] Loya testified that he met with Hammond on two or three occasions to discuss the services requested by the Department and that Hammond brought supportive personnel from Northwest Youth Services and the domestic violence shelter with her to these meetings.

Loya also testified to his opinion regarding Hammond's current ability to provide a safe and sober house for her son. Loya testified that Hammond has adequately addressed her substance abuse. Loya also testified that Hammond has addressed concerns about domestic violence, but stated that Hammond is not able to make proper boundary judgements and has a pattern of domestic violence. Loya testified that he did not believe that there were any additional services that the Department could have offered to Hammond that would have helped her to be in a position to safely and capably parent her son. Loya testified that he believed that placing S.H.-R. back into Hammond's care would present a risk of harm to S.H.-R. and that a guardianship was in S.H.-R.'s best interest.

The trial court also heard testimony from Jesse Charles, the Lummi Nation's caseworker assigned to S.H.-R.'s case. Charles testified that, upon reviewing the Tribe's records and files regarding S.H.-R., it was his opinion that the Department had actively worked with Hammond to engage her in remedial services and rehabilitation programs. Charles testified that he believed that the

---

[4] The Department provided Hammond with a telephone number to call every day to check on whether she had been chosen for a drug screening that day. Hammond failed to appear for such screenings 11 times.

- 10 -

Department had actively worked with Hammond to prevent the breakup of the family and that, although there had been progress in the case, Hammond's progress was insufficient to allow the safe return of S.H.-R. Charles testified that he did not believe that there was a likelihood that conditions would be remedied so that S.H.-R. could return to Hammond's care in the near future. Finally, Charles testified that he believed that it was in S.H.-R.'s best interest to be placed in his grandmothers' care.

The trial court heard additional testimony from Evan Freedman, a forensic psychologist who evaluated Hammond once in 2012, again in 2013, and again in 2015. Freedman testified that his written reports stated that Hammond's prognosis for her capacity to care for S.H.-R. improved from poor to fair over that time period and that Hammond's amenability to benefit from services was upgraded from fair to good. However, Freedman testified that his evaluation of Hammond was predicated in part on her claim that she was not affiliating with any romantic partners. Freedman testified that, upon learning that Hammond was pregnant and had been having contact with Maier, he had concerns about Hammond's capacity to simultaneously care for both an infant and S.H.-R. Freedman also testified that Hammond's association with someone who has a history of criminal behavior and substance abuse was a significant concern and that Hammond's affiliations with romantic partners has historically been a trigger for decompensation.

Upon considering the wealth of testimony and evidence presented throughout the trial, the trial court granted the guardianship petition. On

reconsideration, Hammond argued that the Department had failed to prove that it had used active efforts to prevent the breakup of the Indian family and that those efforts were unsuccessful. The court responded,

> I would note in looking back through my notes that the department did actively engage with her. They provided services of Ms. Glasser, DBT [Dialectical behavior therapy]. They supported her visits with and the work with the therapist, got the psychological evaluation to support that, provided drug and alcohol assistance, provided visits, and did domestic violence services, all of those were things that the department actively tried to make available or did make available, and that Ms. Hammond engaged in from time to time.
>
> . . . .
> . . . I do believe that the State did make active efforts. They may not have been the efforts that Ms. Hammond, perhaps, would liked them to have done. Maybe she would have liked them to have done more, and I think they were active efforts . . . . They did actively involve her.
>
> For a period of time, they worked with this young woman and tried very hard, I believe, to provide the services to her, and she ultimately took advantage of many of those services and made progress as a result of many of those services, but didn't make sufficient progress, and I think that's really what this case ultimately came down to.

Hammond asked the court to decide whether active efforts in the context of an ICWA case are different from the reasonable efforts required in a non-ICWA case. The court responded,

> I'm not sure that I would go so far as to say that active efforts are necessarily different in quantity and quality from reasonable efforts. I would say that active efforts are efforts that involve – I hate to define with the same word, but some sort of activity. The Department needs to be doing something. They need to be taking steps to make services available, to provide those services, and in fact, they did in this case. That's an active effort in my mind, and without some further definition or other case law that says that it requires more than that, I think it just means they have to do something. . . .
> . . . I think they did much, and so I don't think I could say it is inactive, but I'm not going to make a ruling as a matter of law that I

think that active efforts and reasonable efforts are different. I think that's not for this Court to decide today.

On appeal, Hammond raises two concerns to buttress her contention that the Department's efforts were not active. She first asserts that the Department's efforts were not active because the Department did not work with Maier to address its concerns about S.H.-R.'s safety in Maier's presence. But the Department is not obligated to provide services to Maier—who is not a member of the Indian family and who is prohibited by court order from having contact with Hammond.

Moreover, the record establishes that the Department provided services to Hammond to address its concerns regarding Maier—specifically, domestic violence counseling. The record establishes that the Department referred Hammond to domestic violence treatment, requested that she remain in therapy, and met with support personnel from the domestic violence shelter to discuss services. Throughout this process, Hammond lied to the Department and her service providers about having continued contact with Maier and she was ejected from her domestic violence shelter when it was discovered that she was meeting with Maier on a daily basis. Although Hammond asserts that the Department should have offered more services to address this concern, she does not explain what other services the Department could have possibly offered in this situation. "'[A] parent's unwillingness or inability to make use of the services provided excuses the State from offering extra services that might have been helpful.'" A.M., 106 Wn. App. at 136 (internal quotation marks

- 13 -

omitted) (quoting In re Dependency of P.D., 58 Wn. App. 18, 26, 792 P.2d 159 (1990)).

Hammond also contends that the Department's efforts were not active because the Department did not expand Hammond's visitation schedule. But Hammond concedes that visitation is not a remedial service. In re Dependency of T.H., 139 Wn. App. 784, 791-92, 162 P.3d 1141 (2007). In any event, the record shows that Hammond could not manage to adhere to her visitation schedule as it was—failing to show up to scheduled visitation appointments and failing to take direction from visitation supervisors. Even were visitation a remedial service, "ICWA does not require the State to continue making active efforts to remedy parental deficiencies at the expense of physical or emotional damage to the child." A.M., 106 Wn. App. at 136.

The trial court demonstrated its understanding that the Department had the burden of showing that it engaged in active efforts to prevent the breakup of the family. The trial court entertained evidence and heard testimony supporting a finding that the Department actively worked with Hammond to provide her with services that went beyond mere referrals. The record amply supports the trial court's finding that Hammond took some advantage of these services but was often unwilling or unable to make the sort of progress required to allow for the safe return of her son. No trial court error is established.

B

Hammond next contends that the Department failed to prove by clear and convincing evidence that the continued custody of S.H.-R. by Hammond would

- 14 -

likely result in serious emotional or physical damage to the child. This is so, she asserts, because Charles, the Lummi Nation's caseworker assigned to this matter, was not a qualified expert witness.

Pursuant to 25 U.S.C. § 1912(e), a guardianship cannot be established for an Indian child "in the absence of a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." Experts are generally qualified through "'special knowledge of and sensitivity to Indian culture.'" In re Interest of Mahaney, 146 Wn.2d 878, 897, 51 P.3d 776 (2002) (quoting State ex rel. Juvenile Dep't of Multnomah County v. Cooke, 88 Or. App. 176, 744 P.2d 596, 597 (1987)).

Hammond did not object to Charles providing opinion testimony as a qualified expert witness at trial. A party's failure to object at trial waives the issue on appeal. ER 103(a); RAP 2.5(a). Thus, Hammond waived any objection to Charles's testimony.

The trial court's finding is amply supported by the record. Charles testified that it was in S.H.-R.'s best interest to be placed in a guardianship. He explained the Tribe's concerns:

> Again, it's just the mother's ability. We question the fact that, you know, again, she is pregnant by Mr. Maier who she has a no contact order with. It is concerning to us with past history. That concerns us because Mr. Maier could presumably pose a threat to [S.H.-R.], and so that alone I think is enough . . . .

As discussed herein, the trial court also heard testimony from several other individuals about the emotional and physical threat that Hammond's ongoing relationship posed to S.H.-R., as well as testimony that Hammond was unable to appreciate the threat that the relationship posed to her son. The trial court did not err.

C

Finally, Hammond contends that substantial evidence does not support the trial court's finding that there was little likelihood that S.H.-R. could be returned to Hammond's care in the near future.

To establish a guardianship, the Department must show that "[t]here is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future." RCW 13.36.040(2)(c)(v). "The focus of this factor is 'whether parental deficiencies have been corrected.'" In re Dependency of T.R., 108 Wn. App. 149, 165, 29 P.3d 1275 (2001) (quoting In re Dependency of K.R., 128 Wn.2d 129, 144, 904 P.2d 1132 (1995)). What constitutes the near future depends on the age of the child and the circumstances of the child's placement. In re Dependency of T.L.G., 126 Wn. App. 181, 204, 108 P.3d 156 (2005).

Here, the trial court found that S.H.-R. had been dependent for 43 months. The trial court found that, over those 43 months, Hammond had made insufficient progress toward being able to appropriately care for S.H.-R. on a full-time basis. The trial court found that the strongest possible commitment is needed from S.H.-R.'s caretakers to foster his growth and development and that continuation

of the legal parent-child relationship clearly diminishes his prospects for early integration into a stable and permanent home.

The trial court's determination is supported by substantial evidence. Although the trial court heard testimony indicating that Hammond had made progress in adhering to services and maintaining a stable home, the court also heard testimony regarding Hammond's routine visits with Maier in violation of a no-contact order. The trial court heard testimony that Hammond lied to the Department and her service providers for years regarding her ongoing relationship with Maier, as well as testimony that Hammond was unable to appreciate the risk that Maier posed to herself and to her son. Finally, the trial court heard testimony from several individuals that it was unlikely that S.H.-R. could be safely returned to Hammond's care in the near future.

The trial court's determination was supported by substantial evidence. Accordingly, there was no error.

Affirmed.

We concur:

FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON
2017 MAR 27 AM 8:22

Cox, J.

Dwyer, J.

Becker, J.

- 17 -