IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | | |
|---|---|---|---|
| In the Matter of the Dependency of | ) | No. 75169-7-I | |
| KS, | ) | | |
| DOB: 12/20/2013, | ) | DIVISION ONE | |
| Minor child, | ) | | |
| STATE OF WASHINGTON, | ) | | |
| Respondent, | ) | UNPUBLISHED OPINION | |
| v. | ) | FILED: June 19, 2017 | |
| MICHELE FRANK, | ) | | |
| Appellant. | ) | | |

COURT OF APPEALS DIV 1
STATE OF WASHINGTON
FILED
2017 JUN 19 AM 10: 29

BECKER, J. — Michele Frank appeals an order finding her two-year-old son dependent and removing him from her care. Because the findings required by the Indian Child Welfare Act under Washington and federal law are supported by the record, we affirm.

## FACTS

Michele Frank is from Alaska and is an enrolled member of the Ketchikan Indian Community, a subset of the Tlingit and Haida Tribes. She left Alaska with her three daughters in 2012 to "explore America." After living in Arizona for about a year, and then briefly in Nevada and California, she settled in Washington. Frank gave birth to a son, KS, in Arizona in December 2013. KS is

an Indian child as defined by the federal Indian Child Welfare Act of 1978, 25 U.S.C. § 1901, and the Washington State Indian Child Welfare Act, chapter 13.38 RCW.

Child Protective Services became involved with Frank and her four children in March 2015 after receiving a request to perform a welfare check. Jamie Ault, a social worker employed by the Children's Administration, went to Frank's apartment in Richland, Washington, to investigate. When Ault arrived, Frank's four-year-old daughter let her into the apartment. Frank was asleep. The apartment was difficult to enter because of laundry piled up behind the door. Although the children appeared to be well cared for and were appropriately dressed, the apartment was unsanitary with food and empty food containers strewn around on the floor. Frank appeared to be depressed and overwhelmed and admitted to struggling with depression. Frank told Ault that she moved to the Tri-Cities hoping to receive support from her sister who lived in the area, but that support failed to materialize. Ault talked to Frank about the assistance she could offer through the Family Assessment Response program, including helping her to reinstate food benefits and apply for other state benefits, connecting her with mental health resources, and enrolling her children in a Head Start program. Frank told Ault she was a member of an Alaskan tribe, and Ault arranged for notice of the State's involvement to be sent to the tribe.

Ault returned to Frank's apartment the following day and let Frank use her telephone to schedule medical and dental appointments for the children and to set up a mental health intake appointment for herself. Ault helped Frank devise a

2

plan to clean her apartment in stages. Over the next two months, Ault met with Frank more than a dozen times. Ault provided Frank with tangible items such as a car seat, a portable playpen, gift cards for food chains, clothing, shoes, toiletries, cleaning supplies, and diapers. On two occasions, Ault and other volunteers helped Frank clean her apartment. Despite this assistance, Frank was unable to maintain the home in a clean and organized condition, did not take the children to the appointments she scheduled, and did not attend the mental health appointment she made for herself.

Two months later, in May 2015, Frank received an eviction notice. Tracy Sanford, the father of Frank's daughters, had been paying Frank's rent and was no longer able to do so. Ault referred Frank to agencies that offer housing assistance in the Tri-Cities area. When Frank later received a three-day eviction notice, Ault made an appointment to determine if Frank qualified for assistance through an emergency housing program. Ault helped Frank to obtain and complete the required forms. When Frank was denied assistance, Ault identified a different program and made another appointment for Frank. At that point, however, Frank decided to send her three daughters to stay with Sanford in Alaska and relocate to the Puget Sound area.

A few days later, Frank drove to Seattle. After escorting her daughters to the airport, Frank went to KS's father's home in Tacoma. Although KS's father had agreed to take care of KS to allow Frank some time to get "on [her] feet," when Frank arrived at his home, he had been arrested and was not there. Having no money, gasoline, or a place to stay, Frank contacted Ault. Frank

agreed to voluntarily place KS in protective care as a temporary measure.[1]

Frank later explained that she did this because she believed that it was unsafe

for KS to be "out in the streets" with her. Ault arranged for KS to be transported

to the Tri-Cities and placed in foster care.

Frank and Ault agreed that during the voluntary placement, Frank would

look for a safe place to live, enroll in benefits, seek employment, and participate

in mental health treatment. Ault gave Frank information about resources in the

Puget Sound area for housing, mental health, and substance abuse treatment.

Meanwhile, Frank went to an apartment complex where she used to live and

moved in with a former neighbor. However, she described her roommate as

"abusive" and told Ault it was not a safe place for KS. Because of Frank's

relocation, Ault worked to transfer the case to Seattle.

While Frank lived in the Tri-Cities, she communicated regularly with Ault.

After Frank relocated to Seattle, her contact with Ault became more sporadic.

When Frank did speak to Ault, she often reported having lost valuable

possessions, such as the car seat, her cell phone, and eventually, her car.

In July 2015, about a month after voluntarily placing KS in protective care,

Frank requested that KS be returned. Frank had not obtained employment or

enrolled in any treatment but was living in an apartment with a friend called

Robert. As part of the process of return, Frank submitted to a urinalysis test and

tested positive for methamphetamines. She agreed to obtain a substance abuse

---

[1] Ault admitted at trial that she did not realize at the time that she was required to obtain a court order before executing a voluntary placement agreement according to the state and federal Indian Child Welfare Acts. See 25 U.S.C. § 1913(a); RCW 13.38.150(1).

4

evaluation and to participate in continued urinalysis monitoring. While Robert did not appear to have criminal history, other people intermittently stayed at the apartment and none of the people who stayed or lived there completed background checks. When Ault looked up one of the names Frank mentioned, the name appeared on the "America's Most Wanted" list. Frank said she was unaware of any criminal issue and that the person only stayed overnight.

After KS was returned to Frank's care, the case was transferred to the Department of Social and Health Services' Office of Indian Child Welfare in Seattle. During the seven months that that office handled Frank's case, the case was assigned to three different social workers.

Rachel Subido took over the case in August 2015. Frank and KS were living in the woods near a homeless encampment. Subido was unable to locate them. Around this time, Frank met a man called Mike Mau. According to Frank, she began a relationship with Mau largely because KS "instantly" connected with him and called him Dad.

Sometime after August 22, Subido received information that Frank had been admitted to the hospital for treatment for a chemical burn in her eye and a corneal ulcer. Frank had arrived at the hospital with KS and Mau. Frank told hospital staff that Mau was her spouse. Because hospital policy did not allow KS to stay with her without another nonhospitalized adult present, Mau stayed at the hospital for a few nights with KS. Then Mau left with KS one evening and did not return. The next day, Frank admitted to a hospital social worker that Mau was not her husband, that she had met him only a week or two before, and she was

not certain of his real name. She also said that Mau lived at a homeless encampment and was a methamphetamine user. Frank appeared to be extremely concerned, but at the same time appeared to be very "guarded" and asked the hospital social worker not to call the police.

When Subido came to the hospital to see Frank, Frank initially told her that KS was with her mother in Walla Walla. Later, Frank said that KS was with her boyfriend. Frank said that Mau took KS from the hospital so that the Department could not take him. At this point, KS had been missing for two days. Subido called the police.

The Seattle Police Department issued a missing person's alert and began searching for KS. Several hours later in the early morning on August 26, 2015, the police found KS in a heavily wooded area near a homeless encampment south of Seattle. KS was sleeping in a tent with Mau. Apart from some minor scratches and bug bites, he was unharmed. The police took KS into protective custody. Subido brought KS to the hospital to see Frank and then took him for a medical assessment. Frank later said she did not give Mau permission to take KS from the hospital and that when she discovered he was missing, she tried to call 911 from her hospital room and asked hospital staff for assistance, but no one would help her.

Subido spoke to Frank at the hospital about what assistance she needed and how the Department could help her. Frank admitted to Subido that she had used both methamphetamine and heroin. Subido recommended that Frank obtain a drug and alcohol evaluation and provided a list of all the services the

6

Department could offer. Subido tried, without success, to obtain a new cell phone for Frank. Subido asked Frank about relatives who might be able to care for KS and attempted to call all the relatives Frank identified, including Frank's parents and KS's father. Subido contacted the tribe again. She also spoke to Sanford and called Frank's cousin in Alaska.

Frank was discharged from the hospital to a medical respite program that provides temporary housing for patients receiving short-term medical treatment and has caseworkers to assist clients obtain more permanent housing. Frank immediately left that facility. The next day, on August 28, 2015, the Department filed a dependency petition. Frank did not attend the shelter care hearing that took place three days later. The dependency court placed KS in licensed foster care.

Social worker Rose Coleman then took over Frank's case. Coleman informed Frank that she was eligible for an attorney and drove her to the courthouse so that she could be screened for the appointment of counsel. However, Frank did not go the office for screening. The following week, Coleman arranged to meet with Frank at the Indian Child Welfare office in conjunction with a visit with KS. Coleman's supervisor, Cynthia Blair, participated in the meeting. Frank was upset about various small marks and abrasions she observed on KS. Blair looked at each mark with Frank, and although she saw nothing concerning, agreed to discuss the matter with the foster parents. Blair and Coleman stressed the importance of having an attorney and encouraged Frank to return to the courthouse to initiate an appointment.

7

They allowed Frank to use an office telephone to schedule future visits with KS. They provided Frank with a copy of her Alaska identification and a copy of the dependency petition.

Frank agreed to participate in regular urinalysis. Blair and Coleman told Frank about a facility that offers urinalysis testing and about Cowlitz Tribal Health, a provider of mental health and other services with a Native American focus. Blair and Coleman provided information about how to reach these facilities and gave her bus tickets.

About a month later, in October 2015, the case was reassigned for a final time to Erin Dixon. As the other social workers had done, Dixon encouraged Frank to engage in urinalysis testing, mental health services, and to obtain a drug and alcohol evaluation. Although Frank already had been referred for urinalysis testing, Dixon attempted to identify a location which would allow Frank to access the service. She was unable to do so because Frank did not provide information about where she was living. Also for this reason, neither Dixon nor any of the previous social workers were able to assess the safety of her housing. And although Frank initially agreed to participate in some services, after KS was placed out of the home, Frank expressly and repeatedly refused to engage in any services until the Department returned KS to her care.

During the fall of 2015, the social workers continued to investigate potential relative tribal placement for KS. Dixon frequently spoke to the tribe's Indian Child Welfare Act case manager, Misty Archibald. Dixon also spoke to at least two of Frank's relatives and Sanford about the placement of KS.

In October, the Department learned that Frank was staying at the Catherine Booth House, a domestic violence shelter. The shelter offers a 30-day emergency housing program and then a 1-year transitional housing program. Frank confirmed the Catherine Booth House would allow KS to live with her as long as she was engaged in the program's services. However, shortly after she arrived, Frank left the shelter and therefore lost her housing.

Frank had 10 supervised visits with KS between September and November of 2015. On her last visit, which was scheduled to occur on November 18, Frank did not show up, but called the visitation supervisor and hysterically insisted that KS was not safe and demanded that the supervisor take him to the social worker. Frank sounded strange and refused to elaborate on her concerns. She continued to try to contact the supervisor throughout the evening. The supervisor cancelled the visitation contract. Dixon offered to engage a new visit supervisor so that Frank could reinitiate visits with KS, but Frank refused. Frank testified that she stopped visiting with KS because it was distressing for both her and KS to separate from each other at the end of each visit and she was afraid that she would be tempted to abduct KS.

In November 2015, the Ketchikan Indian Community filed a notice of intervention in the case and designated Misty Archibald as its representative.

Before the hearing on the petition, Frank requested a change in the placement of KS, asking for him to be placed with her grandparents in Alaska. The Department agreed that Frank's relatives should be considered for placement but maintained that approval through the Interstate Compact on the

Placement of Children was a necessary prerequisite. The court ordered the Department to initiate this process expeditiously. Frank's grandparents eventually declined to be considered a placement, but shortly thereafter, another relative tribal placement in Alaska was identified and the Department continued investigating that placement up to and during the trial.

The dependency fact-finding hearing took place over the course of seven days in February and March of 2016. The court considered the testimony of 13 witnesses, including Frank, social workers, the Court Appointed Special Advocate, Misty Archibald, and the visitation supervisor. KS was just over two years old.

Frank testified that she became addicted to methamphetamine while living in Washington. She denied using drugs while caring for KS, or at least while KS was awake. She was unsure whether she had used methamphetamine within the past month. Frank testified that she was currently living with a cousin in an apartment near downtown Seattle and had begun to see a counselor through Cowlitz Tribal Health. Frank told the court that if KS were returned to her, she planned to return to Alaska and stay with Sanford and their daughters in Anchorage. But she admitted that Sanford had not yet agreed that she would be able to stay there. She mentioned various other relatives with whom she might visit or live with but acknowledged that she had no specific plan and had not contacted her relatives.

At the conclusion of the hearing, the juvenile court entered findings of fact and conclusions of law and an order of dependency. The court concluded that

the Department met its burden of proving that KS was dependent as to Frank. See RCW 13.34.030(6)(c). The court had previously entered a dependency order as to KS's alleged father. That order is not at issue in this appeal.

The court held a dispositional hearing on March 31, 2016. Frank waived her presence at the hearing. Frank's attorney told the court that the mother did not have a clear position on the disposition because she had "mixed feelings" about whether she wanted the court to place KS immediately with her or with family members in Alaska. The court ordered that KS would remain in licensed care pending approval under the Interstate Compact on the Placement of Children for KS to be moved to Alaska and placed in the care of Frank's relatives. Frank appeals.

## ANALYSIS

To declare a child dependent, a court must find by a preponderance of the evidence that the child meets one of the statutory definitions of dependency. RCW 13.34.110(1); In re Welfare of Key, 119 Wn.2d 600, 612, 836 P.2d 200 (1992), cert. denied, 507 U.S. 927 (1993). In this case, the court found that KS was dependent as that term is defined in RCW 13.34.030(6)(c): a child is dependent where the child "has no parent, guardian, or custodian capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development."

As an initial matter, Frank contends that in the context of a dependency involving an Indian child, the clear and convincing evidence standard of proof,

which is required for additional findings necessary to remove an Indian child from the home, also applies to the finding that the child is dependent as defined by RCW 13.34.030(6). Frank disputes the Department's position that the more stringent standard of proof applies only at the dispositional stage when the juvenile court makes a determination as to whether the child should remain in the parental home or placed in out-of-home care.

Although both parties devote significant portions of their brief to this issue, we need not reach it. The juvenile court, recognizing the absence of controlling precedent on this issue in Washington, applied the higher standard of proof to all issues—the standard advocated by Frank. Moreover, although Frank assigns error to the court's conclusion that the Department proved, by clear and convincing evidence, that KS has "no parent, guardian, or custodian capable of adequately caring for the child," her brief does not include any argument related to this assignment of error. See Brown v. Vail, 169 Wn.2d 318, 336 n.11, 237 P.3d 263 (2010) ("A party that offers no argument in its opening brief on a claimed assignment of error waives the assignment"). The stricter standard of proof that the court applied to the issue of dependency is thus not relevant to any issue Frank raises on appeal. And although the Department argues that the juvenile court erred by applying a higher standard of proof at the dependency fact-finding phase of the proceeding, the Department did not file a cross appeal.

When the court enters an order that removes an Indian child from the home, federal and state statutes place additional burdens on the Department. 25

U.S.C. § 1912; RCW 13.38.130(1), (2). Frank's appeal primarily involves two challenges under these provisions.

In order to place an Indian child in out-of-home care, the federal Indian Child Welfare Act requires:

> No foster care placement may be ordered in such proceeding in the absence of a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

25 U.S.C. § 1912(e). The federal Indian Child Welfare Act defines foster care placement as "any action removing an Indian child from its parent . . . for temporary placement in a foster home or institution or the home of a guardian or conservator where the parent . . . cannot have the child returned upon demand, but where parental rights have not been terminated." 25 U.S.C. § 1903(1)(i).

The Department must also show by clear, cogent, and convincing evidence that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." 25 U.S.C. § 1912(d); RCW 13.38.130. The federal and state statutes are coextensive, "barring specific differences in their statutory language." In re Adoption of T.A.W., 186 Wn.2d 828, 844, 383 P.3d 492 (2016).

## Qualified Expert Witness

Frank contends that the Department failed to prove by clear and convincing evidence that her continued custody of KS would likely result in serious emotional or physical damage to the child. This is so, she asserts, because Archibald was not a qualified expert witness. Frank claims that (1) the Department was required and failed to ask the tribe to designate a qualified expert witness and (2) the tribe neither identified Archibald as a qualified expert witness nor did she possess the requisite knowledge about tribal customs.

At the outset of Archibald's testimony, the Department's attorney asked her if the tribe considered her to be an Indian Child Welfare expert. Her response, as set forth in a problematic transcript, was noncommittal:

> I . . . would not call myself an expert, but some [inaudible] besides being the only one. But, I-I feel like I have a long way to go.

(Alteration in original.)

Archibald proceeded to testify that she is the sole Indian Child Welfare Act social worker for the Ketchikan Indian Community and that she is the assigned caseworker for KS's case. Archibald said she had been actively involved in seeking a relative tribal placement for KS. She testified that she is a member of the Ketchikan Indian Community and that she is familiar with the customs of the tribe and how those customs relate to child rearing. She testified that although she is not an elder in the tribe, she consulted with an elder about KS's placement.

After the State rested, Frank, for the first time, disclosed her intent to call her own qualified expert witness to "shed light on her culture and the importance

of her culture in parenting." Frank argued that such expert testimony was necessary and appropriate because Archibald conceded that she was not an expert, and on that basis, she "could make a half-time motion that the State has not met its burden under the statute."

The court ruled that Archibald was a qualified expert witness. The court reasoned that whether or not Archibald considered herself to be an expert, she is a member of the tribe, the tribe placed her in a position of authority, and she demonstrated knowledge of tribal customs as they relate to family structure, child rearing, and child welfare. The court also allowed Frank to present the testimony of her late-disclosed expert.

Although the federal statute does not define "qualified expert witness," following nonbinding guidelines issued by the federal Bureau of Indian Affairs, the state statute defines a "'qualified expert witness'" as:

> a person who provides testimony in a proceeding under this chapter to assist a court in the determination of whether the continued custody of the child by, or return of the child to, the parent, parents, or Indian custodian, is likely to result in serious emotional or physical damage to the child. In any proceeding in which the child's Indian tribe has intervened pursuant to RCW 13.38.090 or, if the department is the petitioner and the Indian child's tribe has entered into a local agreement with the department for the provision of child welfare services, the petitioner shall contact the tribe and ask the tribe to identify a tribal member or other person of the tribe's choice who is recognized by the tribe as knowledgeable regarding tribal customs as they pertain to family organization or child rearing practices.

RCW 13.38.130(4)(a).

Under the state statute, if the tribe has not intervened in the case or has not responded to the Department's request to designate a qualified expert

15

witness, then the Department may identify a witness who meets one or more of the following criteria:

(i) A member of the child's Indian tribe or other person of the tribe's choice who is recognized by the tribe as knowledgeable regarding tribal customs as they pertain to family organization or child rearing practices for this purpose;

(ii) Any person having substantial experience in the delivery of child and family services to Indians, and extensive knowledge of prevailing social and cultural standards and child rearing practices within the Indian child's tribe;

(iii) Any person having substantial experience in the delivery of child and family services to Indians, and knowledge of prevailing social and cultural standards and child rearing practices in Indian tribes with cultural similarities to the Indian child's tribe; or

(iv) A professional person having substantial education and experience in the area of his or her specialty.

RCW 13.38.130(4)(b).

Frank did not argue below that Archibald was not a qualified expert witness because the Department did not fulfill its statutory obligation to ask the tribe to identify a qualified expert witness. Generally, an issue not raised below is waived on appeal. RAP 2.5.

Nevertheless, we granted the Department's motion to supplement the record. The supplemented record shows that in October 2015, the Department notified the Tlingit and Haida tribes of the dependency petition and of the tribe's right to intervene. The letter also requests that the tribe provide a name and contact information if it wished to designate a "qualified expert witness" who is "knowledgeable about the child's tribe's customs and supports." Although this was not the basis for Frank's objection below, the record before us is sufficient to demonstrate that the Department met its statutory obligation to inform the tribe of

its right to identify a qualified expert witness and supports the inference that Archibald was its designated expert witness.

As to Archibald's qualifications, a "'qualified expert witness'" generally must have expertise beyond the normal social worker qualifications. In re Dependency of Roberts, 46 Wn. App. 748, 755, 732 P.2d 528 (1987). But the Washington Supreme Court has noted that the federal Indian Child Welfare Act "has been interpreted to allow some latitude where experts are concerned." In re Interest of Mahaney, 146 Wn.2d 878, 897, 51 P.3d 776 (2002). Because the purpose of the qualified expert witness provision is to protect against cultural bias, when expert testimony is offered that does not inject cultural bias or subjectivity, courts have held that no special knowledge of Indian life is required. Mahaney, 146 Wn.2d at 897.

For instance, in Mahaney, which involved a non-Indian grandparent's nonparental custody petition, one of the arguments before the Washington Supreme Court was that the experts who testified were not qualified expert witnesses because they lacked any specific familiarity with Indian culture. Noting that the admission of expert opinion was within the trial court's discretion, the Washington Supreme Court concluded that the trial court was entitled to rely on "expert witnesses with specialized training for the medical, psychological, and special needs of the children, even though such experts lack special knowledge of and sensitivity to Indian culture." Mahaney, 146 Wn.2d at 897; see also In re Welfare of Fisher, 31 Wn. App. 550, 553, 643 P.2d 887 (1982) (trial court did not

17

abuse its discretion by determining that a caseworker and supervisor in Seattle Indian Center's foster care program were qualified experts).

Because her complete answer was not transcribed, it is difficult to interpret Archibald's response to the Department's question about her expertise. We surmise that she was reluctant to describe herself as an expert. Even so, Archibald clearly had knowledge of and sensitivity to Indian culture and expertise beyond the usual social worker qualifications. As a member of the tribe and in her capacity as the Indian Child Welfare Act case manager, she testified about her knowledge of the tribe's customs as they relate to raising children. We note that Frank's own expert witness shared the same reluctance to characterize himself as an expert. Like Archibald, Frank's witness said he was familiar with tribal customs, but when asked if he was a tribal elder said:

> We're taught to be humble in our culture. We're taught that we don't say those things about ourselves. We're taught that, uhm, you let somebody else say that for you. . . . I wouldn't call myself an elder, but some people have called me that.

On this record, we cannot say that the juvenile court abused its discretion in determining that Archibald was a qualified expert witness.

### Active Efforts

Frank argues that the Department failed to prove by clear, cogent, and convincing evidence that it consistently exerted active efforts to prevent the breakup of her family.

The federal statute does not define "active efforts." However, the Washington State Indian Child Welfare Act provides that active efforts may be demonstrated through a showing that the Department or supervising agency

social workers "actively worked with the parent, parents, or Indian custodian to engage them in remedial services and rehabilitation programs to prevent the breakup of the family beyond simply providing referrals to such services." RCW 13.38.040(1)(a)(i).

Frank acknowledges that Ault engaged in some active efforts in the Tri-Cities but claims that after she moved to Seattle, the Department reverted to a "pattern of simply providing referrals to services." Frank claims that the social workers merely provided lists of agencies, failed to meaningfully assist her with housing, and did not formally initiate or coordinate any remedial services for her. In addition, Frank contends that until Blair referred her to Cowlitz Tribal Health, the Department failed to offer any culturally appropriate service.

Frank paints an incomplete picture of the Department's efforts. None of the five social workers involved in Frank's case merely provided her with a list. Viewing the Department's efforts as a whole throughout the course of its involvement with Frank and her family, it is clear that it became more difficult for the Department to engage with Frank after she relocated to the Seattle area because for the most part the social workers did not know where Frank was living and had no reliable way to communicate with her. Nevertheless, the evidence shows that the Department made ongoing efforts to reach out to Frank and to engage her in remedial and rehabilitative services, although those efforts were not successful. All of the social workers who worked with Frank recommended remedial services to address mental health and substance abuse, discussed her family and tribal support network, and investigated potential relative tribal

placement. Frank does not identify any culturally appropriate and reasonably available service that the Department failed to offer her. Frank obtained only one urinalysis test in July 2015, and at some later point, she apparently began seeing a counselor through Cowlitz Tribal Health. Otherwise, Frank failed to avail herself of any assistance or remedial services recommended by the Department's social workers.

Although Frank suggests that informing her about housing options and resources was insufficient, it is undisputed that the Department itself does not provide housing. Frank also fails to mention that she voluntarily left two emergency housing placements, thereby foregoing opportunities for long term housing placement. She also does not acknowledge that as a result of the Department's recommendation, she was able to work with a housing specialist at Cowlitz Tribal Health, although she apparently did not acquire housing through this assistance. According to her testimony, Frank ultimately secured housing through her family network.

Frank contends that the Department should have formally initiated services on her behalf. But her stated refusal to participate and her failure to provide critical information to enable the Department to set up services she could use prevented the Department from doing so. Archibald testified that, based on her review of the files in KS's case, the Department had made active efforts to address Frank's parental deficiencies and prevent the break-up of the family. She said:

> I believe they've been making regular facilitation of visits, offering opportunities for Mom to engage in services and providing

20

appropriate referrals, and really working with Mom from the get-go
to work toward reunification.

In addition to the testimony of Ault, Blair, Subido, and Dixon, this evidence

supports the court's finding that the Department made active efforts.

### Likelihood of Serious Emotional and Physical Damage

Frank contends that the record does not support the court's determination

that her continued custody of KS would be likely to result in serious emotional or

physical damage. Frank contends that in light of the evidence that KS is a

healthy child and that his basic needs were met while in her care, there is no

causal connection between any alleged deficiency and a likelihood of serious

damage. Frank claims that the court relied on her lack of stable housing, mental

health concerns, and concerns about past drug use but that none of these issues

create a likelihood of serious emotional or physical damage. She further

contends that the August 2015 incident when KS was missing does not support

the court's conclusion about the likelihood of damage because the hospital's

policies required her to rely on Mau and she cannot be faulted for her judgment

since she was under the influence of pain medication. She also asserts that her

decision not to stop visiting KS in November 2015 was a reasonable measure to

limit her son's distress.

Frank does not dispute that she lacked stable housing after she left the

Tri-Cities area or that she admitted to, and the evidence corroborated, her issues

with drug use and mental health. The gist of Frank's argument is that KS had not

suffered any measurable physical or emotional damage due to these issues, and

therefore, the evidence does not support the court's conclusion that her continued custody would likely result in serious damage in the future.

The juvenile court found:

> Here, all the involved professionals: the CASA, the tribal representative, the social worker and supervisor all concur that the mother's substance abuse, mental health issues, association with unvetted adults, failure to provide a clean and healthy environment, unwillingness or inability to engage in services for herself or her children or to seek stable housing, all present conditions likely to result in serious emotional or physical damage to [KS].

Frank does not refute the fact that several professionals, including the Court Appointed Special Advocate, Blair, and Archibald expressed the opinion that her continued custody would likely result in serious emotional or physical damage. The court did not merely rely on poverty, nonconforming behavior, or nontraditional housing.

Even accepting Frank's claim that her unstable housing, drug use, and mental health issues had not resulted in any negative consequences for KS, there was evidence that these issues put his safety at risk.

When the Department first became involved with Frank, there was evidence that her admitted depression and anxiety was affecting her daily functioning and ability to provide a safe environment for her children. The social workers who later interacted with Frank in Seattle observed that her mental health issues were readily apparent and her condition appeared to be deteriorating. It appeared that Frank's mental health was a contributing factor to her inability to coordinate and follow through with any remedial services. Frank admitted to a methamphetamine addiction. And there was evidence that she had

used the drug while KS was living with her in August 2015. The area where Frank and KS had apparently been living in August 2015 had no running water or facilities and the police officer who led the search indicated that the area was unsafe to enter, particularly at night. After she relocated to Seattle, Frank consistently refused to provide information about her housing so that the Department could evaluate the safety of the housing and confirm that the people she lived with did not have concerning criminal backgrounds.

The hospital's policy about minors did not require Frank to entrust her young child to Mau. As Blair testified, Frank appeared not to be cognizant of certain obvious safety risks, including sleeping while very young children attend to themselves and allowing unknown people to have unsupervised access to young children. Frank testified that she stopped visiting with KS in part to limit his distress, but as the Court Appointed Special Advocate observed, Frank's decision reflected a lack of understanding about her son's need for security and emotional stability. The record supports the court's determination.

<u>Findings of Fact</u>

Frank challenges several findings of fact as unsupported by the record. Frank claims the court's finding that the "intake report expressed concerns about lack of food, lack of supervision, and drug use in the Frank household" is unsupported by admissible evidence. But Ault testified about the substance of the intake report. The Department offered the evidence to explain the basis for her investigation, and the court admitted it for that purpose. Nothing in the court's finding suggests that the court accepted the allegations as true. And Ault

also testified that there was food in the apartment and that she was concerned about Frank's mental state, rather than drug use. Frank also claims that the finding that "the mother was unable to take the children to the doctors' or dental appointments that were scheduled" is supported only by evidence that the court excluded. But Ault's testimony on this point was admitted. The court excluded only Ault's testimony about what she learned from calling the doctor's office.

Frank also challenges the court's finding that "the children needed doctor and dental appointments." The finding is supported by testimony indicating that Frank had moved to the area and the children had no established relationships with health care providers. Finally, Frank challenges the court's finding summarizing the testimony of several witnesses who expressed concerns about her "inability to coordinate services for herself and for [KS]." The finding accurately describes the witnesses' testimony. The finding does not conflict with the court's findings that describes Frank's trial testimony about her engagement in counseling. Each of the findings Frank challenges is supported by substantial evidence in the record.

Affirmed.

Becker, J.

WE CONCUR:

Cox, J.

24